Filed 9/19/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B267529 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. ZM013385) |
| v. | |
| ROBERT EARL WHITE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge. Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Ryan M. Smith, Deputy Attorney General, for Plaintiff and Respondent.

_____

The issue in this case is whether a defendant's various mental conditions,[1] including frotteuristic disorder, exhibitionist disorder, bipolar disorder, and anti-social disorder, which two experts opined would likely result in future acts of sexual battery, satisfy the requirement of the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600, et seq.)[2] that a defendant "will engage in sexually violent criminal behavior." We hold that the trial court properly interpreted the statutory language of the SVPA in finding that under the circumstances in this case sexual battery constitutes sexually violent criminal behavior.

Following a bench trial, the trial court found defendant and appellant Robert White to be a Sexually Violent Predator (SVP). The court's written statement of decision examined two portions of section 6600, subdivision (a)—the requirement that defendant suffered a conviction of a "sexually violent offense," and the additional requirement that due to his mental disorder defendant is likely to engage in predatory "sexually violent criminal behavior." The court determined that two requirements are not synonymous, and the latter provision is broader than the former.

Defendant contends that (1) the trial court incorrectly defined the SVPA's requirement of "sexually violent criminal behavior"; and (2) assuming the trial court used the correct definition, the phrase "sexually violent criminal behavior" is void for vagueness. We affirm.

---

[1] Additional disorders are described in the summary of the experts' testimony below.

[2] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

# FACTUAL AND PROCEDURAL BACKGROUND

**Defendant's Criminal History and Institutional Behavior**[3]

Defendant was the subject of a sustained juvenile delinquency petition for assault with a deadly weapon in 1975. Defendant pleaded guilty in 1979 to assault to commit rape after walking up behind a woman on the street, grabbing her breast and crotch, restraining her, and telling her he would kill her if she did not let him touch her. He then "hump[ed]" her, and made motions to unzip his pants. The victim screamed. Defendant fled and was ultimately chased down by a neighbor.

In 1981, defendant was charged with indecent exposure, disorderly conduct, soliciting a lewd act, and immoral acts before a child. He was convicted of immoral acts before a child. The record does not contain any official description of this offense. Defendant said he had been urinating in public.

In April 1983, defendant was convicted of indecent exposure. Defendant approached a female stranger in a parking lot, unzipped his pants, exposed his penis, and asked, "do you want some of this?"

In October 1983, defendant was charged with annoying or molesting a child, assault to commit rape, rape, fighting, disorderly conduct, and soliciting a lewd act. The charges were dismissed. According to a report, a woman was getting into her parked car

---

[3] The description of defendant's criminal history and institutional behavior is drawn from the testimony of Dr. William Damon, Ph.D., one of the experts at trial. In addition to the offenses set forth in this opinion, Dr. Damon testified that defendant had multiple other convictions that were not pertinent to the SVP determination. Dr. Damon reviewed the following documents in connection with his current evaluation of defendant: the Department of State Hospital's records, including abstracts of judgments, charging documents, probation officers' reports, and police reports; reports from the California State Prisons, including prison mental health, medical records, and disciplinary reports; and state hospital medical, psychiatric, and disciplinary records.

Defendant's statements in this portion of the opinion refer to what he said to Dr. Damon during the SVP investigation.

when defendant suddenly approached her on his bike and said, "Do you want to suck my big dick?" She was afraid, did not respond, and got into her car. Defendant then said, "Do you want to see my big dick?" She was extremely fearful and quickly left. When police found defendant, he initially lied about what he had been doing, but then said that he knew they were stopping him because he had "made comments about her ass."

In December 1984, defendant was charged with sexual battery and convicted of battery after approaching two different women in a grocery store and fondling their buttocks. The store manager and employees saw this occur through a two-way mirror. Defendant was on probation at the time. He initially denied touching the women, but later claimed his suitcase bumped into one of the women. Three days before this incident, police investigated defendant for touching a female victim on her buttocks, but no charges were brought because the victim was unwilling to sign a complaint report.

In July 1998, defendant was convicted of sexual battery after walking into a children's clothing store with his hand in his pocket. He approached the female store clerk while she was behind the register. The clerk feared that he had a weapon in his pocket. As she walked to the front of the cash register, defendant pinned her against the counter with his body with her back towards him. She could feel something poking her in the buttocks. Defendant grabbed the left side of her buttocks, moved his hand up her left side, and grabbed her breast. When the clerk turned around, defendant let her go and walked to the back of the store. She remained in the front of the store. Defendant walked toward the clerk and bumped into her, causing her to knock over some items on the display table. She believed that she would have been raped if it was not for a nearby restaurant with an open patio to the rear of the store. Defendant was on parole at the time of this offense. He initially denied the incident, later stated he bumped into a woman at a store and should have apologized, and finally said that he just slapped a woman on the butt.

In May 1999, defendant was arrested for sexual battery and convicted of battery. Defendant walked through a grocery store with his hand in his pocket. He deliberately bumped into a female stranger as she walked down the aisle. She believed that she felt

4

his penis through his clothing. She continued to walk through the store. While in the checkout line, defendant walked up to her from behind and intentionally bumped his body into her buttocks. Defendant was on parole at the time.

In October 2000, while on parole, defendant was charged with battery and making criminal threats. Defendant was drinking with a man at the man's residence. The two got into an argument. Defendant punched the man in the face and then fled. The man drove to locate defendant. Once defendant was located, he grabbed the man by the throat. The man fled in fear for his life. The next day, defendant returned to the man's house and threatened the man's wife by saying, "the first chance I get I'm going to rape you and fuck the shit out of you."

Defendant was convicted of sexual battery in 2001, for rubbing his erect penis against a woman on a bus. While standing, he leaned into a woman and pushed his erect penis into her shoulder. She leaned away but he continued to press his penis into her shoulder. After she exited the bus, defendant stood behind a female juvenile and began pressing his erect penis into her buttocks area. The juvenile did not feel anything because she had her sweatshirt wrapped around her waist.

Defendant incurred 47 serious prison rules violations while incarcerated, including six sex offenses, three acts of physical aggression, three threatening acts, two instances of possessing weapons, and 11 instances of verbal aggression. The sexual incidents include asking to masturbate in front of a female intern, exposing his erect penis, and masturbating in front of female staff. Defendant was sent to Coalinga State Hospital in 2008 after a parole violation.

At Coalinga, defendant engaged in instances of indecent exposure, verbal sexual aggression, verbal non-sexual aggression, and property damage. Between April 2009 and June 2011, there were 13 indecent exposures, 11 acts of physical aggression, and 33 threats. Between July 2011 to November 2013, there were 12 exposures, 22 acts of physical aggression, 36 threats, 10 instances of verbal sexual aggression, 46 verbal non-sexual aggression, 39 property damage, and 14 instances of contraband possession. From December 2013 through July 2015, there were two exposures documented, one act of

5

physical aggression, three threats, two acts of verbal sexual aggression, four acts of non-sexual verbal aggression, two property damage, and two instances of possession of contraband. There were additional acts of misconduct including frequent sexual comments to female staff, grabbing his clothed penis, and exposing himself to a female medical technician.

**Defendant's psychiatric diagnoses**

*Dr. William Damon*

Dr. Damon, holder of a Ph.D in clinical psychology, has prepared SVP evaluations in various capacities with the Department of State Hospitals since 2007. Dr. Damon evaluated defendant in 2008, 2009, 2011, 2014, and 2015. Defendant was interviewed by Dr. Damon in 2008, 2014, and 2015.

Dr. Damon concluded that defendant suffers from frotteuristic disorder in a controlled environment, exhibitionist disorder in a controlled environment, severe alcohol use disorder in a controlled environment, severe cocaine use disorder in sustained remission in a controlled environment, severe phencyclidine use disorder in sustained remission in a controlled environment, mild cannabis use disorder in a controlled environment, and antisocial personality disorder.

Dr. Damon described frotteuristic disorder as including at least six months of intense sexually arousing fantasies, urges or behaviors involving touching or rubbing against a non-consenting person, and causing stress or impairment in important areas of function. Defendant "has a longstanding pattern of approaching females and touching or grabbing their breasts, vaginal areas or buttocks or touching, rubbing or humping his penis into their bodies." Defendant's behavior has spanned 22 years, including while in the community on supervised release.

Exhibitionism involves recurrent sexual fantasies, urges, or behaviors involving exposing the genitals to a non-consenting person. Defendant "has a longstanding pattern

6

of exposing his genitals to females," including while in the community on supervised released and while in the state hospital.  Defendant has a "unique presentation."  In Dr. Damon's experience there were "maybe two other [men] that have committed some kind of sexual offense at the hospital, but none anywhere near the frequency of [defendant]."

Anti-social personality disorder is "a pattern of disregard for and violation of the rights of others, occurring since age 15 and including at least three of the following:  [¶] Failure to follow lawful behaviors, deceitfulness, impulsivity or failure to plan ahead, aggressiveness, disregard for the safety of self or others, irresponsibility, lack of remorse.  [¶]  And the individual needs to have shown signs of conduct disorder prior to age 15."  Defendant "has numerous charges and convictions that have indicated that he's repeatedly failed to perform or follow lawful behaviors.  [¶]  In terms of deceitfulness he's used multiple aliases, birth dates, social security numbers.  [¶]  His reports of his sex crimes have differed vastly from the narratives of his victims.  [¶]  He admitted selling bogus drugs and forging checks.  [¶]  He admitted feigning thought disorder symptoms and suicidal ideation for secondary gain in institutional settings.  [¶]  And in [Dr. Damon's] recent interview of [defendant] he's denied sex offending behavior and substance use despite it being indicated in the records . . . ."  Defendant continued to engage in antisocial behaviors in the community on supervised release, in prison, and in the state hospital.  He admittedly has poor impulse control.  He is aggressive, including five sexual offenses that have led to convictions for violent or aggressive behavior. Defendant has fought in prison, including assaulting an officer and assaulting a peer.  At the state hospital, he grabbed a nurse by the neck, hit a nurse in the face, and grabbed a nurse and attempted to spit at her.  Defendant reports to having remorse about his sex offending behavior but continued to engage in it at the state hospital.

Dr. Damon expressed the opinion that defendant's "frotteuristic disorder and exhibitionistic disorder predispose him to commit criminal sexual acts.  [¶]  He has continued to offend despite detections, sanctions, despite being on supervised release and despite being in highly structured environments.  [¶]  He's re-offended shortly after sanction.  His desire to engage in sex offending behavior has overcome barriers like

7

victim distress, potential presence of witnesses in public settings, available consensual sexual partners.  [¶]  His substance use disorders I think further decrease his ability to control his behavior.  [¶]  And his antisocial personality disorder affects his emotional capacity because it makes him less likely to respond appropriately to other people's fear and distress."

On the issue of reoffending, Dr. Damon administered two approved actuarial tests. Defendant's scores on both tests placed him in the high risk of offending group.

Defendant is not amenable to treatment and has not been attending sex offender groups while in the state hospital, claiming they do not apply to him since he is not a rapist or child molester.  Defendant is predatory as all of his victims have been strangers or, in the hospital, casual acquaintances.

Dr. Damon opined that defendant is "likely to engage in sexually violent criminal behavior."  Damon came to this conclusion based on six factors:  (1) defendant has a "sexual disorder that predisposes him to hands-on offending"; (2) his history of violence (defining violence as "aggressive behavior") while on supervised release, in prison, and in the state hospital; (3) "he's highly sexually preoccupied"; (4) "he's impulsive and has difficultly regulating his behavior"; (5) he has emotional dysregulation and easily feels disrespected, especially by women; and (6) "he continues to use substances which is likely to increase his impulsivity and self-centeredness and decrease his judgment."

Dr. Damon also believed that defendant "will not necessarily stop with just touching or rubbing a potential victim" given defendant's "sexual impulse," aggression, and behavioral regulation.  Dr. Damon believes that defendant's frotteurism is escalating, and believes it is possible for defendant to go out and rape someone or force somebody to orally copulate him.


### *Dr. Nancy Webber*


Dr. Nancy Webber is a clinical and forensic psychologist with a Ph.D. in psychology, who has been a contract evaluator for SVP determinations since January

8

2007. She performed evaluations on defendant in 2008, 2009, 2011, 2013, and 2015. She interviewed defendant in 2008, 2011, and 2015.

Dr. Weber diagnosed[4] defendant with frotteuristic disorder in a controlled environment, exhibitionist disorder in a controlled environment, bipolar disorder, antisocial personality disorder, and various substance abuse disorders. Defendant's mental health disorders predispose him to committing sexual crimes in a violent, predatory manner. He has a defect in his ability to mediate between impulses and actions, causing him to repeatedly reoffend despite receiving punishment. Defendant has "considerable impulsiveness" and aggressiveness.

Defendant is very poor at predicting his own behavior and does not know what triggers his inappropriate behaviors. Defendant does not intend to do these things but has difficulty controlling his behavior. He lacks remorse or rationalizes his actions. He has "cognitive distortions" and has "made statements such as if he does something sexually inappropriate with a women [*sic*] and she doesn't get angry it must mean . . . she doesn't object to it."

Dr. Webber evaluated defendant's risk of reoffending using several actuarial assessments. He scored high on each of these assessments.

Dr. Webber expressed the opinion that defendant is at risk of engaging in sexually violent predatory behavior because (1) he has a history of engaging in sexually violent behavior; (2) he is sexually preoccupied and "sees the world through sexual lenses"; (3) he reacts in a "rageful manner" when he feels slighted, wronged, or when his sexual advances are rejected; (4) he has poor control over his anger and escalates quickly, acting out verbally, physically, and sexually; (5) he feels entitled to get what he wants when he wants it; (6) he has poor coping skills; and (7) close monitoring in a highly supervised environment with staff trained to de-escalate situation has not "been sufficient to curb his sexual acting out and anger."

---

[4] Dr. Weber based her diagnoses on her review of the same materials and history considered by Dr. Damon.

### Dr. Hy Malinek

Dr. Hy Malinek, Ph.D., called as a witness by defendant, has been a contract evaluator for the Department of State Hospitals for 19 years. Dr. Malinek originally evaluated defendant in 2008. He concluded at that time that defendant met the criteria for a SVP, but has since changed his opinion.

Dr. Malinek diagnosed defendant with antisocial personality disorder because of his lengthy criminal history, including sexual offenses, robbery, and burglary. "He has certainly shown a commitment to a lifestyle of criminality instability, substance abuse, anger." His support for defendant's diagnosis of frotteurism is waning because defendant has not exhibited frotteuristic behaviors in 14 years, even though his exhibitionism has continued. Dr. Malinek believes there would be some evidence of defendant's frotteurism in the last 14 years if the disorder was still active. Defendant does not care about the consequences of his actions and has continued to be aggressive and have persistent exhibitionistic activity.

Dr. Malinek views defendant as a "uniquely difficult and challenging case" because of defendant's "behaviors, his history, his conduct at the hospital, whether this meets the legal statutory requirement for civil commitment." At a 2011 SVP probable cause hearing, Dr. Malinek opined that defendant was predisposed to committing sexually violent offenses because defendant was so "decontrolled" that he may not stop with frotteurism. Dr. Malinek later changed his opinion because subsequent research shows the escalation from frotteurism to rape is rare, and defendant "has never recidivated with a qualifying offense since 1979 and he has been intermittently in the community and committed sexual offenses, not SVP." Dr. Malinek believes that if defendant's behaviors were to escalate to rape, "we would have had some evidence of it given that he has been so defiant, discontrolled and so much disregard for the law and he has not." Dr. Malinek no longer believes that frotteurism is a condition that predisposes defendant to committing sexually violent offenses. There is no inherent link between sex offenses and anger issues. In Dr. Malinek's opinion, defendant is not an SVP. If sexual

10

battery were a qualifying offense, Dr. Malinek would not be sure whether or not defendant would qualify as an SVP, because he is unsure whether defendant's frotteurism is still active.

**Trial Court's Ruling**

The trial court found defendant to be an SVP. In a 28 page written statement of decision and order, the court found that "while there is little substantial evidence in case at bench that [defendant] will commit such sexually violent offenses as rape or other forcible penetrative sex acts or that he will molest children, there is overwhelming evidence that he will commit physically assaultive sexual offenses. The commission of these has their roots in his frotteurism, anti-social personality disorder and related psychopathology, and various substance abuse disorders." The court did not believe the case raised "the issue of the absolute limits of the phrase 'sexually violent criminal behavior' and whether that phrase may be extended to include 'hands off' acts. . . . [F]rotteuristic acts, which really are a form of assault, and, even in their most benign form would constitute sexual battery, a crime . . . , are not 'nuisance'crimes. They have very real and long-term consequences for their victims." Considering defendant's "frotteuristic acts in the Santa Monica clothing store and, to a lesser degree, the bus in Los Angeles, and his repeated threats to kill his victims or force them into other sexual acts, even while incarcerated, there can be no reasonable doubt that there is a serious and well-founded risk that he will engage in sexually violent predatory behavior in the future."

**DISCUSSION**

Defendant presents two issues on appeal. First, he contends the trial court erred in interpreting the SVPA. Specifically, defendant argues the phrase "sexually violent criminal behavior" is synonymous with "sexually violent offense." According to

11

defendant, "the requirement that the person be likely to engage in a sexually violent criminal *behavior* corresponds with the requirement that a person have a qualifying criminal *offense* insofar as the behavior contemplated is that which is deemed sexually violent *under the law*." Because defendant's frotteuristic disorder makes him likely to commit sexual battery, an offense is not included in the definitions of a "sexually violent offense" within the meaning of the SVPA, he does not qualify for commitment as an SVP.

Second, citing *Johnson v. United States* (2015) 576 U.S.___ [135 S.Ct. 2551] (*Johnson*), defendant argues that if the two terms are not synonymous, "sexually violent criminal behavior" is undefined and unconstitutionally vague.

We conclude the opinions of Dr. Damon and Dr. Webber constitute substantial evidence that defendant is likely, at a minimum, to continue to engage in forcible acts of sexual battery as a result of his frotteuristic disorder and other mental disorders. We further conclude that forcible frotteuristic acts of sexual battery, in light of defendant's specific record of conduct combined with his diagnosed mental disorders, qualify in this case as "sexually violent criminal behavior." While there are several forms of sexual battery, including a misdemeanor version that does not require unlawful restraint (Pen. Code, § 243.4, subd. (e)(1)), defendant's likely behavior significantly exceeds the amount of violence necessary for the felony subdivision of the statute (Pen. Code, § 243.4, subd. (a)). (See *People v. Grant* (1992) 8 Cal.App.4th 1105, 1111 [unlawful restraint need not be physical]; *People v. Arnold* (1992) 6 Cal.App.4th 18, 31 [creation of a coercive atmosphere can constitute unlawful restraint].) The form of sexual battery involving unlawful restrained engaged in by defendant satisfies the requirement of violence in the phrase "sexually violent criminal behavior." We further conclude "sexually violent criminal behavior" is not vague and the phrase does not violate due process.

**Standard of Review**

We conduct a de novo review of questions of statutory interpretation. (*People v. Prunty* (2015) 62 Cal.4th 59, 70.) The fundamental task of statutory interpretation is to determine the Legislature's intent so as to effectuate the law's purpose. (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 340.) "We begin with the statute's text, assigning the relevant terms their ordinary meaning, while also taking account of any related provisions and the overall structure of the statutory scheme. (See *People v. Cottle* (2006) 39 Cal.4th 246, 254.) Essential is whether our interpretation, as well as the consequences flowing therefrom, advances the Legislature's intended purpose. (See *People v. Zambia* [(2011] 51 Cal.4th [965,] 976.)" (*People v. Hubbard* (2016) 63 Cal.4th 378, 386.) "'Ordinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning. (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 507.)' (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497.)" (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 725.)

**The Intent and Purpose of the SVPA**

The Legislature issued the following statement of intent and purpose in enacting the SVPA: "The Legislature finds and declares that a small but extremely dangerous group of sexually violent predators that have diagnosable mental disorders can be identified while they are incarcerated. These persons are not safe to be at large and if released represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence. The Legislature further finds and declares that it is in the interest of society to identify these individuals prior to the expiration of their terms of imprisonment. It is the intent of the Legislature that once identified, these individuals, if found to be likely to commit acts of sexually violent criminal behavior beyond a

13

reasonable doubt, be confined and treated until such time that it can be determined that they no longer present a threat to society.

"The Legislature further finds and declares that while these individuals have been duly punished for their criminal acts, they are, if adjudicated sexually violent predators, a continuing threat to society. The continuing danger posed by these individuals and the continuing basis for their judicial commitment is a currently diagnosed mental disorder which predisposes them to engage in sexually violent criminal behavior. It is the intent of the Legislature that these individuals be committed and treated for their disorders only as long as the disorders persist and not for any punitive purposes." (Stats. 1995, ch. 763, § 1.)

**Basis for Commitment as an SVP**

In its current form the SVPA provides in part: "'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) The three elements required for an SVP commitment are: (1) conviction of "a sexually violent offense"; (2) a diagnosed mental disorder that makes a person a danger to the health and safety of others; and (3) the mental disorder makes it likely the defendant will engage in "sexually violent criminal behavior." (*Ibid.*)

The second and third elements of the SVPA require a link between a finding of future dangerousness and "a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1158 (*Hubbart*).) Commitment as an SVP requires proof that a defendant "is likely to engage in future predatory acts" of sexually violent criminal behavior. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1190 (*Hurtado*).) A person is likely to engage in sexually violent criminal behavior if "the person charged as a sexually violent

14

predator poses a substantial danger, that is, a serious and well-founded risk, of committing a sexually violent predatory crime if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988-989 (*Roberge*).)

Defendant's 1979 conviction of assault with intent to commit rape satisfies the requirement of a conviction of a sexually violent offense as defined in section 6600, subdivision (b).[5] Defendant's diagnoses of frotteuristic disorder, exhibitionist disorder, bipolar disorder, and anti-social disorder, collectively satisfy the second element of a diagnosed mental condition making him a danger to the health and safety of others. What is at issue here is whether defendant's frotteurism and other disorders, which in the opinion of two doctors are likely to cause him to commit acts of sexual battery, qualifies as "sexually violent criminal behavior."

The SVPA includes a definition of "sexually violent offense." (§ 6600, subd. (b).) It does not contain a definition of "sexually violent criminal behavior." It appears case law has not specifically addressed the meaning of "sexually violent criminal behavior," and in particular, whether it means something different than a "sexually violent offense." Presumably the issue has not arisen because persons subject to commitment as an SVP are deemed likely to commit the type of sexually violent criminal behavior that is consistent with their prior convictions of a "sexually violent offense." (See *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 649–650 [defendant previously convicted of engaging in lewd and lascivious conduct and committed as an SVP deemed by two evaluators as "still an SVP"]; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 236–238 (*Cooley*) [defendant with multiple convictions of lewd conduct with a minor under the age of 14 diagnosed with "the qualifying mental disorder pedophilia, and was likely to

_____

[5] Section 6600, subdivision (b), provides in pertinent part as follows: "'Sexually violent offense' means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as defined in subdivision (a): . . . any felony violation of Section . . . 220 of the Penal Code, committed with the intent to commit a violation of Section 261 . . . of the Penal Code."

15

engage in sexually violent criminal behavior on his release"]; *Roberge*, *supra*, 29 Cal.4th at p. 983 [defendant with multiple forcible rape convictions diagnosed with several mental disorders and likely to reoffend]; *Hurtado*, *supra*, 28 Cal.4th at pp. 1183–1184 [defendant with multiple convictions of sodomy and lewd and lascivious acts on minors, diagnosed with pedophilia, had a likely and considerable risk of reoffending]; *Hubbart*, *supra*, 19 Cal.4th at pp. 1149–1150 [defendant convicted of various violent sex offenses involving six victims in two cases and diagnosed with a paraphilia had a high risk of reoffending].)

### Interpretation of "Sexually Violent Criminal Behavior"

We disagree with defendant's primary contention that "sexually violent criminal behavior" is the equivalent of "sexually violent offense." We begin with the plain language of the Legislature, focusing first on its distinct phraseology of the first and third elements under the SVPA as found in the statement of legislative intent and in the statutory language. This differentiation in phrases indicates they are not synonymous.

The Legislature's statement of intent and the language of the SVPA distinguish between the predicate requirement of a conviction of a "sexually violent offense" and third requirement of the likelihood of a defendant engaging in "sexually violent criminal behavior." While a statutorily defined predicate conviction of a sexually violent offense is required, the focus on a defendant's likely future conduct is more broadly stated in terms of behavior, specifically avoiding reference to a discrete number of statutorily defined criminal offenses. Rather than limiting the range of conduct to the offenses defined as a violent sexual offenses, the Legislature chose instead to look at predatory behavior, subject to the limitation that the conduct be sexual, violent, and criminal. Persons who are likely to engage in such behavior as a result of a mental disorder present a continuing threat to public safety, as expressed in the Legislature's statement of intent.

"The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the statute as a whole.

16

[Citations.] A corollary rule is that every word and phrase employed is presumed to be intended to have meaning and perform a useful function [citation]; a construction rendering some words in the statute useless or redundant is to be avoided. [¶] Where the same word or phrase might have been used in the same connection in different portions of a statute but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored. [Citations.] [¶] Finally, where general words follow a specific enumeration of particular classes of persons or things, the general words will be presumed as applicable to persons or things of the same general nature or class as those enumerated. [Citations.]" (*Playboy Enterprises, Inc. v. Superior Court* (1984) 154 Cal.App.3d 14, 20-21.)

Defendant's interpretation of the statute would deprive the term "criminal behavior" of its independent meaning. Had the Legislature intended to restrict the institutionalization of individuals to those who only pose a risk of committing the selected offenses, it would have done so. As the Legislature chose to use two different terms, we cannot interpret these terms to have the same meaning.

The term "sexually violent criminal behavior" is linked to the clause of the SVPA requiring a diagnosed mental disorder. We read the two portions of the statute in context. "[A] finding of 'likely [to] engage in sexually violent criminal behavior' is expressly *dependent* on the existence of a statutorily defined mental disorder: 'a diagnosed mental disorder *that makes the person* a danger to the health and safety of other *in that* it is likely that he or she will engage in sexually violent criminal behavior.' [Citation.]" (*Cooley*, *supra*, 29 Cal.4th at p. 248.) An individual's mental illness, as defined by the SVPA, affects the individual's "volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) The mental illness makes the individual likely to commit certain actions, or predisposes them to behave in certain ways. (*People v. Williams* (2003) 31 Cal.4th 757, 769; *Cooley*, *supra*, at p. 249.) "The SVPA thus consistently emphasizes the themes common to valid civil commitment statutes, i.e., a current *mental condition or disorder* that makes it difficult or impossible to control

17

volitional behavior and *predisposes* the person to inflict harm on himself or others, thus producing *dangerousness* measured by a high risk or threat of further injurious acts if the person is not confined. (*Hubbart*, *supra*, 19 Cal.4th [at pp.] 1152–1164 [rejecting substantive due process challenge to California SVPA statute, noting that the statute validly requires a mental disorder producing dangerousness]; see *Kansas v. Hendricks* (1997) 521 U.S. 346, 358 (*Hendricks*) [upholding similar Kansas SVPA].)" (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 920.) The inquiry into behaviors is not an inquiry into whether an individual's behavior may trigger future prosecutions, but whether the behaviors indicate a mental illness that predisposes a person to act in certain ways that put the public at risk.

The SVPA is similar to the Kansas statute before the Supreme Court in *Hendricks*, *supra*, 521 U.S. 346. As the *Hendricks* court observed, commitment under the Kansas act "requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated. *As we have recognized, '[p]revious instances of violent behavior are an important indicator of future violent tendencies.'* [Citations.]" (*Hendricks*, *supra*, at pp. 357–358, italics added.)

Having construed the SVPA, we have no difficulty in upholding the trial court's finding that the opinions of Dr. Damon and Dr. Webber, combined with defendant's unrelenting history of frotteuristic behavior, make it likely he will engage, at a minimum, in acts of forcible sexual battery. Aggressive frotteurism as exhibited by defendant involves assaulting individuals in a predatory, sexualized manner, without their consent, leading the victims to believe that they are going to be raped. This is undoubtedly sexually violent criminal behavior.[6] (See, e.g., *People v. Valdez* (2001) 89 Cal.App.4th

---

[6] As noted by one court, "a woman or a young girl, so closely confined on a crowded subway car that she cannot move, who suddenly feels the erect penis of a stranger repeatedly ground into her body is unlikely to perceive that event as nothing more than a minor annoyance. [Fn. omitted.]" (*State v. Michael R.* (N.Y. Sup. Ct. 2014) 986 N.Y.S.2d 868.)

18

1013, 1016 [sexual battery is crime of violence for the purposes of the mentally disordered offender statute].) The Legislature views such conduct as sexual in nature, as Penal Code section 290, subdivision (c), requires individuals convicted of felony sexual battery under Penal Code section 243.4, subdivision (a), to register as sex offenders. As the trial court noted, other states have found that sexual battery of the type exhibited by defendant constitutes an act of sexual violence. (See, e.g., *Kansas v. Crane* (2002) 534 U.S. 407 [upholding a determination that a repeat sexual batterer with exhibitionism and anti-social personality disorder with some control over his actions could be civilly committed and noting that Kansas's scheme required that an individual be likely to engage in repeated acts of sexual violence].)

The trial record supports a finding that defendant is violent, unable to control his behaviors, and has intense sexual fantasies about touching non-consenting women. Even while institutionalized defendant exposes himself with some regularity, believing that women are looking at his crotch and want to see his penis. He asks women to perform acts of oral copulation on him as he approaches them in a threatening manner. He is also prone to rages when rejected. The prosecution experts at trial agreed that defendant's disorders prevent him from controlling his violent sexual behaviors. His behaviors extended to non-consensual touching by instilling fear of rape. Over an extended number of years, defendant has exhibited behaviors consistent with aggressive frotteurism, including restraining women to grab their buttocks and genetalia and "humping" them from behind.

Our interpretation of the SVPA and application to this case is consistent with what our Supreme Court has identified as the purpose of the statutory scheme. The SVPA has a "narrow and important purpose—confining and treating mentally disordered individuals who have demonstrated their inability to control specific sexually violent behavior through the commission of similar prior crimes." (*Hubbart*, *supra*, 19 Cal.4th at p. 1164; accord, *People v. McKee* (2010) 47 Cal.4th 1172, 1194 [the purpose of the SVPA scheme is "'to establish "civil commitment proceedings" in order to provide "treatment" to mentally disordered individuals who cannot control sexually violent criminal

19

behavior'"].) "[T]he Act targets sexual offenders who suffer from a diagnosed 'volitional impairment' making them 'dangerous beyond their control.' (*Hendricks*, *supra*, 521 U.S. [at p.] 358.]" (*Hubbart*, *supra*, at p. 1157.) "The SVPA also establishes the requisite connection between impaired volitional control and the danger posed to the public." (*Hubbart*, *supra*, at p. 1158.) "[T]he SVPA plainly requires a finding of dangerousness. The statute then 'links that finding' to a current diagnosed mental disorder characterized by the inability to control dangerous sexual behavior. (*Hendricks*, *supra*, 521 U.S. [at p.] 358.)" (*Hubbart*, *supra*, at p. 1158.) Defendant's mental disorders and conduct satisfy each of the purposes.

Although civil commitment based on frotteurism is not common, courts in other jurisdictions have upheld civil commitments for sex offenders suffering from the disorder. (*In re Thompson* (Kan.Ct.App., July 22, 2016, No. 114,617) 2016 WL 3961541, at *2; *In re Ritchie* (2014) 50 Kan.App.2d 698, 708–709; *State v. William W.* (2013) 962 N.Y.S.2d 43, 44; *In re Hanenberg* (N.D. 2010) 777 N.W.2d 62, 66; *In re Detention of Hodges* (Iowa 2004) 689 N.W.2d 467, 468–469; *In re Care and Treatment of Kennedy* (2003) 353 S.C. 394, 398–400.) Each case is, of course, fact specific, but there is no blanket rule prohibiting civil commitment of a sex offender who suffers from frotteurism.

## "Sexually Violent Criminal Behavior" is not Void for Vagueness

Defendant also contends that the term "sexually violent criminal behavior" is vague on its face, arguing that that judges and juries would be free to determine *ad hoc* what constitutes a sexually violent criminal behavior. We disagree. ". . . California courts have rejected numerous constitutional challenges to the SVPA and have resolved

various statutory interpretation questions arising from the statutory scheme.  [Citations.]"
(*Turner v. Superior Court* (2003) 105 Cal.App.4th 1046, 1055.) [7]

"The Fifth Amendment provides that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.'  Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.  [(*Kolender v. Lawson* (1983) 461 U.S. 352, 357–358)].  The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'  [(*Connally v. General Constr. Co.* (1926) 269 U.S. 385, 391)].  These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences.  [(*United States v. Batchelder* (1979) 442 U.S. 114, 123)]."  (*Johnson*, *supra*, 135 S.Ct. at pp. 2556–2557.)

Our Supreme Court "has recognized 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.  [Citations.]  A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.'"  (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143.)  Therefore, 'a party must do more than identify some instances in which the application of the statute may be uncertain or

---

[7] Among the cases rejecting constitutional challenges to various portions of the SVPA include the following:  *Hubbart*, *supra*, 19 Cal.4th at pages 1151–1170 [SVPA's definition of "diagnosed mental disorder," requirement of current dangerousness, and lack of guarantee of treatment do not violate due process; statutory scheme also does not violate equal protection]; *People v. Lopez* (2004) 123 Cal.App.4th 1306 at pages 1312–1313 [SVPA's definition of "substantial sexual conduct" is not unconstitutionally vague by failing to define "masturbation"]; and *People v. Buffington* (1999) 74 Cal.App.4th 1149 at pages 1153–1154 [rejecting argument that SVPA violates due process on the theory that proof that a defendant is "likely" to engage in sexually violent criminal behavior dilutes the requirement of proof beyond a reasonable doubt that the disorder makes defendant likely to engage in sexually violent criminal behavior does not violate due process].

21

ambiguous; he must demonstrate that "the law is impermissibly vague *in all of its applications.*" [Citation.]' (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201.) Stated differently, '"[a] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language." [Citation.]' (*People v. Ervin* (1997) 53 Cal.App.4th 1323, 1329.)" (*People v. Morgan* (2007) 42 Cal.4th 593, 605–06.)

Due process arguments based on vagueness that are essentially indistinguishable from defendant's contention have been rejected by several courts in other jurisdictions. (*U.S. v. Carta* (1st Cir. 2010) 592 F.3d 34, 43 [rejecting due process challenge for vagueness to 18 U.S.C. § 4248—the federal civil commitment provision for sex offenders—as to language that a defendant has "serious difficulty in refraining from sexually violent conduct" resulting from a "serious mental illness, abnormality, or disorder"; the "terms are sufficiently explicit to give notice and prevent arbitrary enforcement, and the present statute also passes muster"]; accord, *United States v. Abregana* (D. Hawaii 2008) 574 F.Supp.2d 1123, 1142 [the term "sexually violent conduct" has a plain meaning].) "Other courts addressing void for vagueness challenges to civil commitment statutes employing similar terms have found them to be constitutionally sufficient. [(See *In re K.A.P.* (Pa.Super.Ct.2007) 916 A.2d 1152, 1159; *Westerheide v. State* (Fla.2002) 831 So.2d 93, 106; *Martin v. Reinstein* (Ariz.Ct.App.1999) 195 Ariz. 293; *In Re Young* (1993) 122 Wash.2d 1)]." (*U.S. v. Abregana*, *supra*, at p. 1141.) We agree with the sound reasoning of these authorities.

Defendant's reliance on *Johnson*, *supra*, 135 S.Ct. 346, is misplaced. The *Johnson* court held that the portion of the Armed Career Criminal Act of 1984 (18 U.S.C. § 924(e)(2)(B)) defining "violent felony" as "any felony that 'involves conduct that presents a serious potential risk of physical injury to another'" is unconstitutionally vague. The court identified two features rendering the provision vague. First, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." (*Id.* at p. 2557.) Second, "the residual

22

clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." (*Id.* at p. 2558.)

That portion of the SVPA requiring evidence that a defendant is likely to engage in sexually violent criminal behavior suffers from neither of the defects identified in *Johnson*. There is no uncertainty regarding the risk involved in sexually violent criminal behavior. Under the SVPA, "a person is 'likely [to] engage in sexually violent criminal behavior' if at trial the person is found to present a *substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody. [Fn. omitted.]" (*Roberge*, *supra*, 29 Cal.4th at p. 988.) The required factual determination lacks the uncertainty deemed fatal to the statute in *Johnson*. Conduct that is violent and sexual is well-defined in the Penal Code, and as noted above, includes the form of sexual battery engaged in by defendant. The SVPA is not vague in regard to the likely behavior of the defendant—it must be predatory, sexual, and violent. These terms have common meanings that require no further definition and fall far short of unconstitutional vagueness.

We have two final points as to why the reasoning of *Johnson* has no application to this case. First, "from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct." (*Schall v. Martin* (1984) 467 U.S. 253, 278.) The *Johnson* court made clear that the "dozens of federal and state criminal laws use terms like 'substantial risk,' 'grave risk,' and 'unreasonable risk,'" are "[n]ot at all" subject to "constitutional doubt," because "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree,' [(*Nash v. United States* (1913) 229 U.S. 373, 377)]." (*Johnson*, *supra*, 135 S.Ct. at p. 2561.) The SVPA's requirement of a sexually violent criminal offense, linked to a diagnosed mental disorder, is the type of qualitative standard deemed permissible in *Johnson*. Second, the Supreme Court in *Hendricks* rejected a due process challenge to a Kansas civil commitment statute which required proof that

23

"persons who, due to a 'mental abnormality' or a 'personality disorder, are likely to engage in 'predatory acts of sexual violence.' Kan. Stat. Ann. § 59–29a01 *et seq*. (1994)." (*Hendricks*, *supra*, 521 U.S. at p. 350, 360.) Nothing in *Johnson* indicates the Supreme Court intended to suggest *Hendricks* was incorrectly decided or that there is a due process issue in statutes akin to the SVPA.

Contrary to defendant's contentions, the term "sexually violent" provides sufficient notice to the public regarding what conduct might trigger a civil commitment. Defendant contends that the trial court's definition of "sexually violent" was focused on a hypothetical traumatic risk to a victim, claiming that possessing child pornography could be an act of sexual violence under this definition. This mischaracterizes the trial court's findings, which explicitly stated that defendant's frotteurism demonstrated that he is likely to engage in a form of sexual battery which is predatory, sexual, violent, and criminal in nature. "Sexually violent criminal behavior" does not include the type of "hands off" offenses described by defendant. Simply pointing to marginal, hypothetical cases, that arguably may not be covered by the statute, is insufficient to show that the SVPA is unconstitutionally vague.

## DISPOSITION

The judgment is affirmed.


KRIEGLER, J.


We concur:



TURNER, P.J.                                          BAKER, J.


24