Filed 4/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B280329 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA046248) |
| v. | |
| BENJAMIN FRANDSEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Eric Harmon, Judge. Affirmed as modified.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb, Zee Rodriguez and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Benjamin Frandsen appeals from a judgment sentencing him to 19 years to life for second degree murder and involuntary manslaughter. He contends his convictions should be reversed because the second degree felony-murder rule is unconstitutionally vague, there was insufficient evidence to support his conviction, and the prosecutor committed misconduct. He also contends the trial court erred when it failed to consider his ability to pay before imposing two assessments and a restitution fine. He further argues the trial court improperly increased the amount of victim restitution. We correct a clerical error in the abstract of judgment, but otherwise affirm the judgment.

## FACTS

Frandsen and several others held Benjamin Wertzberger and Adar Ne'eman prisoner at Shane Huang's house on December 2, 2002, because they believed the victims had stolen $6,000 worth of marijuana from Huang. Frandsen and Huang were the only ones in the house with Wertzberger and Ne'eman when they were killed on December 2 or 3. Their bodies were found buried in the desert months later. The testimony from eyewitnesses and from Frandsen himself regarding the events leading up to the killings are loosely consistent and presented below.

*The Perpetrators and The Victims*

Frandsen is a former Marine with extensive martial arts training. Nick Turner is Frandsen's roommate and is also a former Marine. In 2002, Frandsen became friends with Huang, who grew marijuana for sale in his home in Canoga Park. Wertzberger lived with Huang in the summer of 2002, and took care of the marijuana plants in exchange for a place to stay.

2

The house had a door hidden by a mirror in the hallway leading to the bedrooms where the marijuana "grow rooms" were maintained. The grow rooms were sealed off from the rest of the house. Jamil Kharboutli was also involved in Huang's marijuana operation.

On November 29, 2002, Ne'eman, who was Wertzberger's childhood friend, arrived for a visit from Israel. Wertzberger, Ne'eman, and Kharboutli went to a nightclub together the following night.

The next day, Huang asked Frandsen to come over because someone had broken into his house. He claimed $6,000 worth of dried marijuana had been taken from a closet in one of the grow rooms. Huang initially suspected the perpetrator was Joseph Pistone, who had done some plumbing work in the grow rooms. Pistone denied having anything to do with the break-in, and Huang apologized. Huang loaned Frandsen and Turner $1,000 to help them pay rent, because he was grateful for their help.

Huang subsequently told Frandsen and Turner he suspected Wertzberger had taken the marijuana because he was the only other person who knew about the marijuana operation. Huang said he was uncomfortable having the marijuana plants in the house because he did not feel safe there.

*The Events of December 2 and 3*

The next morning, on December 2, Huang asked Frandsen and Turner to help clean and move the marijuana plants. When Frandsen initially said no, Huang offered to forgive the $1,000 loan in exchange for their help. They agreed to come that afternoon.

That day, Pistone was working on a plumbing job at Kharboutli's house while Huang was there, complaining about

3

the stolen marijuana. At the time, they suspected the culprit was Wertzberger. Huang arranged to meet Wertzberger at Kharboutli's home, but Huang went home when Wertzberger failed to arrive because he had a "bad feeling." Fifteen minutes after leaving, Huang called Kharboutli and told him he "caught" Wertzberger "back at the Desoto house ripping him off again" and that he "had him at knifepoint." Huang found Ne'eman sitting in a car parked outside, and forced him into the house at knifepoint. Kharboutli went to Huang's house and Pistone followed an hour later.

Pistone arrived at Huang's house around 3:00 p.m., and saw Wertzberger and Ne'eman sitting on a couch in the living room with Huang standing over them holding a sword. Huang was "furious," venting about how he gave Wertzberger money and a place to live, which he repaid by ripping off Huang. Huang threatened, "My boys will be here shortly to take care of this."

Frandsen and Turner arrived at Huang's house soon thereafter. Pistone testified Frandsen, who was wearing leather gloves, immediately stood in front of Wertzberger and Ne'eman, and repeatedly pounded his fist into the palm of his other hand. Although they had previously appeared calm, Pistone observed Wertzberger and Ne'eman to be afraid when Frandsen and Turner arrived. Huang repeatedly interrogated Wertzberger about what he had done with the marijuana. Wertzberger vacillated between admitting he had taken the marijuana and denying it. Pistone acknowledged he participated in the interrogation and spat on Wertzberger at one point.

Huang was unsure what he was going to do with Wertzberger and Ne'eman. Huang was concerned that if he let the men go, they would steal from him again or call the police

4

and report the grow operation.  Huang raised the possibility of killing Wertzberger and Ne'eman and leaving their car in Las Vegas.  Pistone and Kharboutli objected to any plan to kill Wertzberger and Ne'eman, but Pistone saw Frandsen nod his head, appearing to agree with Huang.

At one point, Huang retrieved a suitcase from Wertzberger's vehicle, which he searched for cash.  When he found none, he took cash from the victims' wallets and Pistone saw him give what appeared to be thousands of dollars to Frandsen.  Huang eventually concocted a plan to contact their families in Israel if Wertzberger and Ne'eman decided to go to the police.  Frandsen suggested they obtain collateral from the victims or their families.  Huang and Frandsen obtained the telephone numbers and addresses of the families from Wertzberger and Ne'eman, then left the house together.  Turner, Kharboutli, and Pistone remained at the house with Wertzberger and Ne'eman.

Huang and Frandsen met with Ora Vossen, a friend from Israel who speaks Hebrew.  Huang told her that someone had broken into his residence and stolen from him.  Vossen used Huang's cellular telephone, and an international calling card, to call Ne'eman's sister and Wertzberger's mother to verify the victims' addresses in Israel.  Vossen was outside of the restaurant waiting for a cab when she overheard Huang say to Frandsen, "I don't want to dirty my hands."  Frandsen responded, "I'll do it."

Frandsen and Huang then went to an apartment in Venice, where Huang's friend lived.  Huang asked his friend what he should do with "a couple [of] kids" he was holding who had broken into his house and stolen his plants.  Huang's friend

advised him to "beat the shit out of [them]" and then "let them go." Huang appeared to agree.

When Frandsen and Huang returned to the house, it appeared to Pistone that the issue had been resolved and that they were going to release Wertzberger and Ne'eman. Frandsen and Huang left the house a second time to get sandwiches. When they returned, they also brought Home Depot bags, a shovel, and some rope. Pistone asked Kharboutli what was going on. He responded that "they were just going to scare them" to obtain money or get the marijuana back.

Pistone and Kharboutli then left to process marijuana at Kharboutli's home. As they were leaving, Pistone observed Huang binding the victims' legs with duct tape. Turner left soon after the other two did.

The parties stipulated that Wertzberger and Ne'eman were killed on or between December 2 and December 3, 2002. A few days later, Kharboutli and Pistone went to Huang's residence. Huang, Frandsen, and Turner were all present. When Pistone entered the room, Frandsen got him in a headlock, to demonstrate something to the other men. Pistone pushed Frandsen away. Kharboutli asked Huang what happened to Wertzberger and Ne'eman. Huang replied, "We let them go." He then stated, "But they're missing-in-action."

*Frandsen's Admissions*

Frandsen told Turner he killed Ne'eman with a blow to the neck. He also told at least three other friends about the murders. On December 5, 2002, Frandsen met with his ex-girlfriend, Lyndsay Devore, with whom he had a close relationship. He told her there had been a "scuffle" at Huang's house and "two men wound up dead." She asked Frandsen how they died. Frandsen

6

made a motion with his arms signifying strangulation or asphyxiation. When Devore observed, "[i]t was like a snake killing a mouse," Frandsen agreed. Devore believed Frandsen had killed one of the victims because he had rushed at Frandsen. She told Frandsen to turn himself in and claim self-defense. Frandsen shook his head no.

Frandsen told Devore that he and Huang had buried the victims' bodies in the desert, then drove to Las Vegas and used the victims' credit cards to make it seem as if they were still alive. A few weeks later, Frandsen retracted his story and told Devore he had sent the victims back home to Israel.

Towards the end of December 2002, Frandsen told his friend, Sam Edmonson, something bad and life altering had occurred. Frandsen said, there "may be some people that nobody is looking for anymore." When Edmonson visited in March 2003, Frandsen told him that he and Huang had been at Huang's residence watching television when Frandsen got up to use the restroom. He encountered two men in the hallway; one had a gun, and the other had a knife. Frandsen "reacted how he was trained to react," and used his martial arts training to break the neck of the man with the gun, and to turn the other man's knife back into his own chest, killing both men. Frandsen was crying when he told Edmonson about it.

Frandsen also told Edmonson Huang did not want to call the police because of his marijuana operation, so they buried the bodies in the desert and left the victims' car in Las Vegas. Frandsen said he was afraid of Huang and thought he might kill his family. Nevertheless, Frandsen subsequently introduced Huang to Edmonson.

In February 2003, Frandsen told a childhood friend, Rogelio Flores, that he had killed two men. Frandsen explained that he had been at a friend's residence when two men broke in and attacked him. Frandsen said one man came at him with a knife, which he turned against his attacker to stab him. Frandsen said the second man rushed at Frandsen, and he placed the man in a headlock and "broke" the man's neck. Frandsen told Flores that he had acted in self-defense. He seemed "distraught" to Flores.

*The Investigation*

On December 7, 2002, Wertzberger's car was impounded by Las Vegas authorities after having been parked at an expired meter for several days. The car was in a part of the city known for prostitution and drug use, and it was left unlocked with the keys in the ignition. The vehicle was full of luggage and DJ equipment. The vehicle contained Ne'eman's wallet, identification, and an expired plane ticket to Israel.

In the interim, Wertzberger's and Ne'eman's families became concerned when they could not be reached. Ne'eman's mother called Wertzberger's cell phone, but an unknown male answered. She asked to speak with Wertzberger or Ne'eman, but the man stated that they had gone "to the canyon for two hours." She then checked credit card and bank accounts that she shared with her son, and saw that the credit card had last been used on December 3, 2002, at a clothing store and an Outback Steakhouse in Las Vegas, and that a transaction at a Best Buy store had been rejected for being over the card's credit limit.

Ne'eman's mother contacted the police departments for Los Angeles and Las Vegas, but each declined to investigate the disappearance. The families hired a private investigator, and the

mothers flew to the United States to search for their sons. In March 2003, the Israeli consulate helped them open an investigation with the FBI. The FBI traced the call Ne'eman's sister received in December 2002 to Huang's cell phone, and connected Wertzberger's cell phone records to Huang. They also learned Wertzberger had once lived at Huang's home.

FBI agents attempted to interview Kharboutli in March of 2003, but he did not give them a statement at that time. He subsequently moved to the Czech Republic in April or May of 2003. He was interviewed by the authorities in 2016.

On April 8, 2003, FBI agents searched Huang's home and discovered the two hidden grow rooms, but the plants had been removed. They recovered marijuana, pills, bongs, mushrooms, cash, and a sawed-off shotgun, but did not take a metal sword and martial arts weaponry.

In August of 2003, FBI agents interviewed Pistone, who initially denied any knowledge of the victims' disappearance. A few days later, Pistone called the agents and told them Wertzberger and Ne'eman had been held captive at Huang's house, and that he had last seen them alive when he left that night. Pistone subsequently agreed to wear a recording device to assist in the investigation against Huang.

Huang was arrested on September 12, 2003. His home was searched a second time during which agents recovered from the residence $10,000 in cash, a .22-caliber rifle, a .22-caliber handgun, .22-caliber ammunition, a dart gun, a sword, a folding knife, a telescopic baton, martial arts weaponry, duct tape, and two shovels.

*The Interview with Frandsen*

After the deaths of Wertzberger and Ne'eman, Frandsen moved to Yellowstone National Park.  He waived his *Miranda*[1] rights when FBI agents interviewed him on September 14, 2003.  The jury heard Frandsen's interview at trial, and were given transcripts to assist them in following the recording.  Frandsen told the agents he saw Huang two weeks earlier and received a message from Huang when the FBI raided Huang's home two days earlier.

Frandsen initially denied knowing anything about the marijuana operation or the disappearance of Wertzberger and Ne'eman.  He also attempted to divert attention away from Huang and himself by telling the FBI agents he met Wertzberger at a club on the night of either December 2 or 9.  According to Frandsen, Wertzberger borrowed Huang's cell phone to make a call with a calling card.  He said Wertzberger was with a man and a woman, both in their mid-twenties.  Frandsen also told the FBI he had heard that some DJ had supposedly stolen from the Chinese mafia, and he thought Wertzberger's disappearance could be related to that.  Frandsen said he had met Wertzberger only that one time and thought he was a "weasel."

When the agents advised Frandsen they had witnesses and telephone records connecting him to the disappearance of Wertzberger and Ne'eman, Frandsen admitted he, Huang, and the others held Wertzberger and Ne'eman captive at Huang's house.  His account of the events loosely corresponded to Pistone's, as described above.  However, he told them Turner left

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436.

almost immediately after they arrived at Huang's house, and that he and Huang left Wertzberger and Ne'eman alive in Las Vegas.

Frandsen said he offered to let Wertzberger and Ne'eman go, telling them, "Here are your options . . . You leave. You never say anything. And, we're gonna follow you to Vegas. You stay in Vegas. You don't come back here anymore." Frandsen said he then drove Wertzberger to Las Vegas in Wertzberger's car while Ne'eman rode with Huang in Huang's car. He said they all went to Outback Steakhouse, but Ne'eman and Wertzberger did not eat; Ne'eman paid for Frandsen and Huang's meal. They also went to a clothing store and had Wertzberger and Ne'eman wait outside while they used Ne'eman's credit card to purchase clothing for themselves. Frandsen indicated he and Huang left Wertzberger and Ne'eman alive at a Las Vegas motel and that Huang gave Wertzberger's cell phone to a prostitute outside of the motel. Frandsen and Huang then drove back to Los Angeles together in Huang's car.

The agents disbelieved Frandsen and demanded to know where the victims' bodies were located, encouraging him to bring closure to the victims' families. The agents told Frandsen they did not think he intended to kill anyone, and that he should not "take the fall" for Huang, who would likely implicate Frandsen.

Frandsen then changed his story, stating, "if they are dead, I think I have a clue where – within a square mile where they are." Frandsen asked for a deal, expressing concern for the criminal consequences if he told the agents where he thought the bodies were located. The agents told Frandsen they could not make any promises to him, but that it would be helpful to him if he cooperated.

11

Frandsen then changed his story yet again. He told the agents that he and Huang had in fact left Wertzberger and Ne'eman alive at a motel in Las Vegas. However, Frandsen said he and Huang went on a later trip to Las Vegas and that while there, Huang told Frandsen that he needed some time alone. As a result, Frandsen left Huang at a campsite for an hour or two. Frandsen told the agents that he wanted a specific deal in order to provide them with more precise information about the location where he and Huang had stopped. The agents took Frandsen into custody.

After searching Frandsen's cabin, the agents recovered a pair of pants that he had purchased with Ne'eman's credit card, and a CD of Wertzberger's music that Frandsen had taken from Wertzberger's car. When the agents were preparing to transport Frandsen from Yellowstone National Park, he told them that the location where he and Huang had stopped was near a blue building with an internet address listed on a billboard.

*Discovery of the Bodies*

On September 18, 2003, FBI agents searched the area where Frandsen had indicated the bodies of Wertzberger and Ne'eman might be located. They found Wertzberger's and Ne'eman's bodies buried in a single grave. Also in the grave were pieces of duct tape, which were not attached to any body part.

An autopsy showed Ne'eman had injuries to his fourth cervical vertebra and a fracture to the mid-neck. His thyroid cartilage had also been crushed. Because the bodies were badly decomposed, it was impossible to tell whether Ne'eman had any ligature marks or hemorrhaging. The forensic pathologist opined that Ne'eman's injuries were more consistent with a blow to the throat than with strangulation, but there were injuries to two

sides of his neck, and those injuries were not sustained from the same blow. She concluded Ne'eman died as a result of blunt-force injuries to the neck.

Wertzberger's body was too badly decomposed to determine the fatal injury. The forensic pathologist saw no broken bones, or any injury demonstrating strangulation. She also could not determine whether he had been stabbed. She concluded Wertzberger died as a result of "homicidal violence."

*Prior Proceedings*

A 2004 information charged Frandsen, Huang, and Turner with the murder of Wertzberger and Ne'eman (counts 1-2; Penal Code, § 187, subd. (a).)[2] Turner pleaded guilty to two counts of false imprisonment and received probation in exchange for his testimony against Huang and Frandsen. In 2005, Frandsen and Huang were separately tried and both were convicted of first degree murder with the special circumstance of multiple murders. Both appealed, but only the judgment against Huang was affirmed. (*People v. Huang* (Oct. 2, 2007, B192819) [nonpub. opn.].)

The judgment against Frandsen was reversed for instructional error. (*People v. Frandsen* (Sept. 11, 2007, B191189) [nonpub. opn.].) Frandsen was retried in 2009 and convicted of the second degree murder of Ne'eman and the involuntary manslaughter of Wertzberger. These convictions were affirmed. (*People v. Frandsen* (2011) 196 Cal.App.4th 266.) However, Frandsen's petition for writ of habeas corpus was granted by the Los Angeles Superior Court because one of the

---

[2] All further section references are to the Penal Code unless otherwise specified.

13

jurors in the second trial did not have sufficient understanding of English to sit as an impartial juror.

*Current Proceedings*

On November 16, 2016, the People filed an amended information charging Frandsen with the involuntary manslaughter of Wertzberger (count 1; § 192, subd. (b)) and second degree murder of Ne'eman (count 2; § 187 subd. (a)). Frandsen was tried a third time on these charges. The People presented testimony and evidence setting forth the events as described above.

Frandsen testified on his own behalf. His version of events prior to the departure of Turner, Pistone, and Kharboutli was generally consistent with the other witnesses' testimony. Frandsen testified that when he and Turner arrived at Huang's house on December 2, Huang met them outside and told them that "the idiots came back." Huang wanted to intimidate them into returning his marijuana, so he told Frandsen and Turner to "stand there and look tough." Frandsen went inside the home and punched his hand repeatedly into a gloved fist in front of Wertzberger and Ne'eman, while Huang, Pistone, and Kharboutli angrily demanded the return of the marijuana. Frandsen testified Pistone spit on Wertzberger, threw a soda can at him, and slapped the men. Wertzberger urinated on himself in fear.

After five or ten minutes, Frandsen left to prepare the marijuana plants for transport while Turner stayed in the living room to mediate. Turner encouraged the men to give Huang the marijuana back if in fact they had stolen it. Huang and Pistone discussed beating up Wertzberger and Ne'eman. Huang stated that he wanted to kill the men, but everyone objected. Kharboutli asserted, "If you kill them, you must kill me, too."

14

Huang then instructed Pistone to tie up Wertzberger and Ne'eman, and Pistone bound their hands and feet with duct tape. Wertzberger and Ne'eman were subsequently untied to allow them to eat the food that Frandsen and Huang had picked up. Frandsen also recalled that Huang dunked Wertzberger's head under water in the bathroom. Huang claimed Wertzberger then confessed to taking the marijuana. Frandsen also stated Huang took money from Ne'eman's suitcase, which had been in Wertzberger's vehicle.

Frandsen came up with a plan to have Wertzberger's and Ne'eman's relatives send money to Huang. Ne'eman agreed to have his family send $5,000 to Huang from Israel.

Once they obtained the contact information for the families in Israel, Frandsen and Huang went to see Vossen, who used Huang's cell phone to call the families. Frandsen did not hear what was said on the call. When Frandsen and Huang left Vossen, they went to see Huang's friend in Venice.

When they returned to Huang's residence, it seemed to Frandsen that Huang had calmed down and was no longer angry. Frandsen and Huang told Wertzberger and Ne'eman that they were going to let them go, but they would follow them to the freeway to make sure that they did not return.

After Turner, Pistone, and Kharboutli left, Wertzberger and Ne'eman spoke to each other in Hebrew. Wertzberger then got up and walked toward the bathroom, and Huang followed him. Moments later, Frandsen heard a loud thump that sounded like a door slamming shut, followed by a crash and multiple thumps.

Ne'eman stood up and Frandsen looked towards the bathroom. He heard glass breaking and turned to see Ne'eman rushing toward him with a large bong raised above his head. Frandsen threw up an elbow, which struck Ne'eman in the throat and caused him to fall to the ground. Since Ne'eman was incapacitated, Frandsen moved toward the bathroom and saw Wertzberger dead on the floor. When Frandsen returned to the living room, he saw Huang holding a plastic bag over Ne'eman's face. Ne'eman took one final breath and died.

Huang devised a plan to bury the victims. Frandsen went along with the plan because he "didn't know what else to do" and did not think the authorities would believe he did not participate in the murders. At trial, Frandsen acknowledged Ne'eman may have died because of the blow to the throat, and that Huang's act of placing a bag on his head might have been "redundant."

Before they left to bury the bodies, Huang told Frandsen, "I don't want to think of you as a threat to me," to which Frandsen responded, "What the hell is that supposed to mean?" Huang replied, "I don't want to have to call your mom too." While Frandsen was digging the grave in the desert, Huang came up to him and opened his shirt to display a pistol in his waistband. Huang stated, "I thought about it, but you're never going to say anything anyway and I can't drive two cars back at once."

After they buried the bodies, Frandsen and Huang drove to Las Vegas and used Ne'eman's credit cards to purchase clothing at a retail store and a meal at Outback Steakhouse to make it seem as if the men were still alive. Frandsen and Turner then helped Huang move the marijuana plants out of his residence.

Frandsen testified Huang was no longer his friend, but admitted he exchanged Christmas gifts with him weeks later, traveled to Miami with him in February 2003, met him in a nightclub in San Francisco, and continued to socialize with him in June 2003. Huang called Frandsen's mother to wish her a happy Mother's Day, which Frandsen considered to be a threat.

Frandsen further explained that his ex-girlfriend misinterpreted the gesture he made showing what he did to Ne'eman. He testified he told his friends he had killed both victims because he did not want to implicate Huang. He denied keeping information from the FBI about the location of the bodies. He asserted he gave them specific information about where to locate the bodies during the unrecorded portion of his interview because he did not want Huang to hear his voice directing authorities to the location of the bodies. Frandsen also called several character witnesses who testified that they did not know him to be a violent person.

The jury found Frandsen guilty on both counts. He was sentenced to 19 years to life, comprised of 15 years to life on count 2 plus four consecutive years on count 1. In addition to various fees and fines, Frandsen was ordered to pay victim restitution in the amount of $11,749.20. The trial court set a future hearing date for the parties to discuss other possible restitution. Frandsen timely appealed.

## DISCUSSION

## I. The Second Degree Felony-Murder Rule is Not Unconstitutionally Vague

Relying on *Johnson v. United States* (2015) __U.S. __ [135 S.Ct. 2551] (*Johnson*), Frandsen contends his conviction must be

17

reversed because the second degree felony-murder rule is unconstitutionally vague. We disagree.

### A. The Supreme Court's Decision in *Johnson*

In *Johnson*, the U.S. Supreme Court declared a portion of the federal Armed Career Criminal Act (ACCA) to be unconstitutionally vague. Under the ACCA, a defendant convicted of certain firearm offenses faces more severe punishment if he has three or more previous convictions for a "serious drug offense" or a "violent felony." (18 U.S.C. § 924(e)(1).) The ACCA defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that— [¶] (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or [¶] (ii) is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury to another*[.]" (18 U.S.C. § 924(e)(B), italics added.)

The italicized portion of the statute is known as the residual clause of the ACCA and was the subject of the high court's ire. (*Johnson, supra,* 135 S.Ct. at p. 2556.)

Because the prior convictions may come from different jurisdictions, courts must use a "categorical approach" when deciding whether an offense is a violent felony under the ACCA residual clause, looking not to the particular statute that was violated or to how the individual offender committed the crime on a particular occasion, but to a generic or "ordinary" version of the crime. (*Taylor v. United States* (1990) 495 U.S. 575, 598.) Thus,

a court considers the kind of conduct that the crime prohibits in the "ordinary" case and assesses whether that abstraction presents a serious potential risk of physical injury. A court does not consider the individual facts of the case or the elements of the criminal statute. (*Johnson, supra,* 135 S.Ct. at p. 2557.)

In *Johnson,* the defendant pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). His sentence was enhanced under the ACCA because he had three prior convictions for violent felonies, including unlawful possession of a short-barreled shotgun in violation of Minnesota law. The U.S. Supreme Court granted certiorari to decide whether possession of a short-barreled shotgun constituted a violent felony under the residual clause. It later asked the parties to address the compatibility of the residual clause with the Constitution's prohibition against vague criminal laws. (*Johnson, supra,* 135 S.Ct. at p. 2556.)

The court identified two features of the residual clause that conspire to make it unconstitutionally vague: (1) the clause "leaves grave uncertainty about how to estimate the risk posed by a crime" because it ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime, "not to real-world facts or statutory elements;" and (2) the clause simultaneously "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." (*Johnson, supra,* 135 S.Ct. at pp. 2557–2558.)

As to the first area of uncertainty, the court explained that "assessing 'potential risk' seemingly requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out," which involves a speculative enterprise detached from the statutory elements. (*Johnson, supra,* 135 S.Ct.

19

at pp. 2557–2558.)  As to the second area of uncertainty, the court explained that the four offenses (burglary, arson, extortion, and crimes involving use of explosives) enumerated prior to the residual clause posed widely disparate degrees of risk of physical injury.

According to the court, "[b]y combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." (*Johnson, supra,* 135 S.Ct. at p. 2558.)  It concluded, "Each of the uncertainties in the residual clause may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.' " (*Id.* at p. 2560.)

The high court rejected the contention that its holding would create constitutional doubt in criminal laws that use terms like "substantial risk," "grave risk," and "unreasonable risk." (*Johnson, supra,* 135 S.Ct. at p. 2561.)  It reasoned, "Almost none of the cited laws links a phrase such as 'substantial risk' to a confusing list of examples.  'The phrase "shades of red," standing alone, does not generate confusion or unpredictability; but the phrase "fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red" assuredly does so.' [Citation.]  More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.*  As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree,'

20

[citation.]" (*Id.* at p. 2561.) The court further explained, "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." (*Id.* at p. 2558.)

### B. Second Degree Felony Murder in California

"The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state. The rule has two applications: first degree felony murder and second degree felony murder. . . . First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery. Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189. . . .' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*).) In California, the second degree felony-murder rule "lies imbedded in our law." (*People v. Phillips* (1966) 64 Cal.2d 574, 582, overruled on another ground by *People v. Hood* (1998) 18 Cal.4th 470, 490.)

The California Supreme Court recently explained that the felony murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony that is inherently dangerous to life.[3]

---

[3] Senate Bill 1437 (2017-2018 Reg. Sess.), effective January 1, 2019, amends section 188, subdivision (a)(3) to read: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." This statutory amendment brings into question the ongoing viability of second degree felony murder in California. The parties have not raised

21

(*Chun, supra*, 45 Cal.4th at p. 1183.) "Implied malice, for which the second degree felony-murder doctrine acts as a substitute, has both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' [Citation.] [¶] The second degree felony-murder rule eliminates the need for the prosecution to establish the *mental* component. The justification therefor is that, when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life because, by declaring the conduct to be felonious, society has warned him of the risk involved. The *physical* requirement, however, remains the same; by committing a felony inherently dangerous to life, the defendant has committed 'an act, the natural consequences of which are dangerous to life' [citation], thus satisfying the physical component of implied malice." (*People v. Patterson* (1989) 49 Cal.3d 615, 626, fn. omitted (*Patterson*).)

In assessing whether a crime is inherently dangerous to human life, a court looks to the elements of the felony in the abstract, not at the particular facts of the case. (*Phillips, supra,* 64 Cal.2d at p. 582; *People v. Howard* (2005) 34 Cal.4th 1129,

---

this issue, however, and we need not address it because it does not appear the Legislature intended for this amendment to apply retroactively. (§ 3 [" 'No part of [the Penal Code] is retroactive, unless expressly so declared.' "]; *People v. Brown* (2012) 54 Cal.4th 314, 319.)

1135 (*Howard*).)  In doing so, the court ensures the felony " 'by its very nature . . . cannot be committed without creating a substantial risk that someone will be killed . . . .' " (*Howard, supra,* at p. 1135.)  " 'This form of [viewed-in-the-abstract] analysis is compelled because there is a killing in every case where the rule might potentially be applied.  If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous.' " (*Patterson, supra*, 49 Cal.3d at p. 622, quoting *People v. Burroughs* (1984) 35 Cal.3d 824, 830.)

Where a felony statute proscribes an "essentially single form of conduct," the court must examine the statute as a whole to determine the inherent dangerousness of a felony.  (*Patterson, supra,* 49 Cal.3d at pp. 623–624.)  Where the statute lacks a primary element and, instead, includes a variety of offenses, the proscribed conduct may be severed to determine whether it is inherently dangerous.  (*Id.* at pp. 624–625*.)*

In *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1225, the court concluded that kidnapping for extortion is an inherently dangerous offense that supports a second degree felony-murder conviction.  Other felonies that have also been found to be inherently dangerous to life include poisoning with intent to injure, arson of a motor vehicle, kidnapping, and reckless or malicious possession of a destructive device.  (*Howard, supra,* 34 Cal.4th at p. 1136 [collecting cases].)

23

**C. The Second Degree Felony-Murder Rule Relies on a Statutory Elements Approach Approved Under *Johnson***

Frandsen attempts to apply *Johnson's* criticism of the ACCA residual clause to the California second degree felony-murder rule. He contends that, like the ACCA residual clause, the second degree felony-murder rule is unconstitutionally vague because it precludes consideration of real world facts showing how the individual offender committed the crime. (See *Phillips, supra,* 64 Cal.2d at p. 582.) We are not persuaded.[4]

A close reading of *Johnson* illuminates the critical difference between how a court assesses crimes under the residual clause and the second degree felony-murder rule. As discussed above, *Johnson* held the core infirmity with the ACCA residual clause is that it anchors risk to hypothetical facts. That is, the residual clause impermissibly "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or *statutory elements*." (*Johnson, supra,* 135 S.Ct. at p. 2557, italics added.) Implicit in this holding is that a crime is not unconstitutionally vague if a court

---

[4] This case presents an issue of first impression. In *In re White* (order to show cause issued Jul. 26, 2017, S233265), the California Supreme Court issued a return to Division Two of the Fourth District Court of Appeal in a case involving second degree felony murder premised on the illegal manufacture of methamphetamine. The court ordered "[t]he Secretary of the Department of Corrections . . . to show cause . . . why petitioner is not entitled to a reversal of his second degree felony murder conviction because the reasoning set forth in [*Johnson, supra,* 135 S.Ct. 2551] renders the California second-degree murder rule unconstitutionally vague."

assesses risk by one of two alternative methods:  consideration of the real-world facts underlying the conviction *or consideration of the statutory elements of the crime.*

California courts have adopted this reading of *Johnson* when evaluating other crimes.  In *People v. Ledesma* (2017) 14 Cal.App.5th 830, 839–840 (*Ledesma*), for example, the defendant relied on *Johnson* to challenge the definition of aggravated kidnapping to commit rape, which requires "movement of the victim [] beyond that merely incidental to the commission of, and [which] increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).)  The defendant also challenged similar asportation language contained in section 667.61, subdivision (d)(2) that permitted more severe sentencing for the crime of rape where " 'the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense.' "  (*Ledesma, supra,* 14 Cal.App.5th at p. 835.)  The defendant argued this asportation requirement was unconstitutionally vague because it was not sufficiently concrete to give citizens fair warning of the crime.  The *Ledesma* court disagreed, explaining that "[u]nlike the residual clause at issue in *Johnson*, California's asportation requirement compels juries and courts to apply a legal standard to real-world facts."  (*Id.* at p. 838.)

Likewise, the court in *People v. White* (2016) 3 Cal.App.5th 433, 453–454, held the term "sexually violent criminal behavior" contained in the Sexually Violent Predator Act (Welf. & Inst. Code, § 6600 et seq.) was not unconstitutionally vague because it required a sexually violent criminal offense—which is well defined in the Penal Code—that is linked with a diagnosed

25

mental disorder. (*White, supra,* at p. 454.) Thus, the Sexually Violent Predator Act also required the fact finder to apply a legal standard to real-world facts.

The second degree felony-murder rule at issue in this case utilizes the second alternative approach identified in *Johnson*—a statutory elements evaluation of risk. Such an approach avoids the uncertainties identified by the *Johnson* court as fatal to the ACCA residual clause. This is because when a court evaluates the statutory elements of the crime, it is not required to "imagine" what an "ordinary" crime would look like. Neither is a defendant required to guess at whether his conduct is dangerous to life. Rather, the court must determine, by examining the elements of the crime, whether it could possibly be committed without creating a substantial risk that someone will be killed. (See *Howard, supra,* at p. 1135.) Thus, the two uncertainties identified in *Johnson*—how to estimate the risk posed by a crime and how much risk is required to qualify as a violent/inherently dangerous crime—are alleviated.

A comparison of how courts assess crimes under the ACCA and the second degree felony-murder rule illustrates the significant differences between the approaches. In *James v. United States* (2007) 550 U.S. 192, 226 (*James*)—a case cited in *Johnson* to illustrate how speculative and *detached from statutory elements* a categorical approach under the ACCA presents—the court was tasked with deciding whether an attempted burglary is a violent felony under the residual clause. The majority and the dissent set forth vastly different scenarios to support their respective positions: the majority envisioned a confrontation in which a homeowner may chase after a would-be burglar, while the dissent envisioned a confrontation limited to a

homeowner yelling, "who's there?" and the would-be burglar running away. (*James, supra,* at pp. 211, 226.) As the *Johnson* court observed, the residual clause offered "no reliable way to choose between these competing accounts of what 'ordinary' attempted burglary involves." (*Johnson, supra,* 135 S.Ct. at p. 2558.)

In stark contrast, the court in *People v. Hansen* (1994) 9 Cal.4th 300 (*Hansen*) overruled on another point in *Chun, supra*, 45 Cal.4th at pages 1198–1199, employed the statutory elements approach to determine whether the felony of discharging a firearm at an inhabited dwelling (§ 246) is inherently dangerous for purposes of the second degree felony-murder rule. After considering the elements of the crime, the court explained: "An inhabited dwelling house is one in which persons reside [citation] and where occupants 'are generally *in* or *around* the premises.' [Citation.] In firing a gun at such a structure, there always will exist a significant likelihood that an occupant may be present. Although it is true that a defendant may be guilty of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent [citation], the offense nonetheless is one that, viewed in the abstract--as shooting at a structure that currently is used for dwelling purposes--poses a great risk or 'high probability' of death . . . ." (*Hansen,* at p. 310.)

It is clear from the *Hansen* court's reasoning that a statutory elements approach does not present the same speculative enterprise as required under the ACCA residual clause. Indeed, the *Johnson* court indicated its holding properly extends only to a statute like the ACCA that contains an internally-contradictory phrase like " ' "fire-engine red, light

27

pink, maroon, *navy blue*, or colors that otherwise involve shades of red.". . . ' " (*Johnson, supra*, 135 S.Ct. at p. 2561.) This internal contradiction is unique to the ACCA, and thus *Johnson* has no application to the second degree felony-murder rule. In short, the second degree felony-murder rule does not present the same constitutional infirmities as the residual clause under the ACCA.

## II.  The Instruction on Kidnapping for Extortion Did Not Misstate the Law

Frandsen next contends the jury was improperly instructed on second degree felony murder premised on kidnapping for extortion because the instruction misstated the law. We find his argument meritless. As an initial matter, Frandsen has forfeited this claim, having failed to object or seek a clarifying instruction on this issue at trial. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1138, overruled on a different ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) In any event, the trial court did not misstate the law in its instruction to the jury.

The court instructed the jury with CALCRIM No. 541A, which defines the crime of second degree felony murder when the defendant committed the fatal act. Frandsen challenges the inclusion of the following sentence in that instruction: "The crime of kidnapping for extortion continues until a defendant has reached a place of temporary safety." Frandsen contends this sentence misstates the law because kidnapping for extortion is complete when a person seizes a victim with the intent to extort. Not so.

*People v. Cavitt* (2004) 33 Cal.4th 187, 207 (*Cavitt*), is instructive. There, the defendants similarly argued the underlying felonies—burglary and robbery—had ended before the

28

victim was killed, relieving them of liability for felony murder. (*Id.* at p. 206.) The court rejected this argument, holding that felony murder applies when the killing and the felony are part of one continuous transaction, including a defendant's flight after the felony to a place of temporary safety. (*Id.* at p. 207; see also *People v. Ainsworth* (1988) 45 Cal.3d 984, 1015–1016.)

The court explained, "Our reliance on the continuous-transaction doctrine is consistent with the purpose of the felony-murder statute, which 'was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the [felony] before the homicide was completed.' " (*Cavitt, supra,* 33 Cal.4th at p. 207, quoting *People v. Chavez* (1951) 37 Cal.2d 656, 669–670.)

This holding comports with the California Supreme Court's well-established rule that "the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and [the defendant] has reached a place of temporary safety . . . ." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159 (*Barnett*); *People v. Burney* (2009) 47 Cal. 4th 203, 233 (*Burney*).) The sentence included in CALCRIM No. 541A did not misstate the law.

Frandsen's reliance on *People v. Anderson* (1979) 97 Cal.App.3d 419 (*Anderson*), is misplaced. In *Anderson*, the Court of Appeal found that "kidnapping for ransom is complete when the kidnapping is done for the specific purpose of obtaining ransom even though the purpose is not accomplished." (*Id.* at p. 425.) The court made this statement while discussing the

difference between kidnapping for ransom and attempted kidnapping for ransom. The court held that obtaining the property that is the target of the kidnapping for ransom is not an element of the offense and the failure to do so does not render the kidnapping a mere attempt rather than a completed kidnapping. *Anderson* does not stand for the proposition that kidnapping for ransom cannot continue past the initial act of taking a person. (*Ibid.*) In other words, *Anderson* does not contravene the authority set forth in *Barnett, supra,* 17 Cal.4th at page 1159 and *Burney, supra,* 47 Cal.4th at page 233.

We are also not persuaded by Frandsen's claim that the challenged sentence should only be given if the facts indicate the homicide happened while the defendant was fleeing. As *Cavitt* explained, the continuous-transaction doctrine makes unnecessary " 'any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the [felony] before the homicide was completed.' " (*Cavitt, supra,* 33 Cal.4th at p. 207.)

## III. Substantial Evidence Supports the Conviction for Kidnapping for Extortion

Frandsen contends the evidence is insufficient to support the conviction for kidnapping for extortion. Specifically, he claims there is no evidence he aided and abetted the crime. We disagree.

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it

30

appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) "Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment." (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

Under subdivision (a) of section 209, "[a]ny person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, is guilty of a felony . . . ." Unlike other forms of kidnapping, as defined in subdivision (b) of section 209, kidnapping for extortion under subdivision (a) does not require asportation as an element of the crime. (*People v. Mayfield* (1997) 14 Cal.4th 668, 771, fn. 10, overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)

To establish liability under an aiding and abetting theory, the prosecution is required to prove the defendant knew of the perpetrator's unlawful purpose, and intended to and did aid, facilitate, promote, encourage, or instigate the commission of the crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) Presence at the scene of a crime, alone, is insufficient to establish aiding and abetting liability. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530.) However, the aider and abettor need

31

not have advance knowledge of the crime or the perpetrator's intent. "Aiding and abetting may be committed 'on the spur of the moment,' that is, as instantaneously as the criminal act itself. [Citation.]" (*People v. Nguyen, supra,* 21 Cal.App.4th at p. 532.)

In *People v. Cooper* (1991) 53 Cal.3d 1158 (*Cooper*), the court held that "a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." (*Id.* at p. 1161; see also *People v. Montoya* (1994) 7 Cal.4th 1027, 1039 [upholding burglary conviction for aider and abettor who did not have knowledge of criminal purpose until after entry].) The court reasoned, "The logic of viewing 'committed' as a fixed point in time for purposes of guilt-establishment and 'commission' as a temporal continuum for purposes of determining accomplice liability can be seen from the perspectives of both the victim and the accomplice. The rape victim, for example, would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial penetration). Rather, the offense does not end until all of the acts that constitute the rape have ceased. Furthermore, the unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts is an accomplice under this concept of 'commission,' because he formed his intent to facilitate the commission of the rape *during its commission.*" (*Cooper, supra*, 53 Cal.3d at p. 1164, fn. 7.)

We are persuaded by the analysis in *Cooper* to find substantial evidence supports a finding Frandsen aided and abetted to kidnap the victims for extortion. It is irrelevant that Frandsen learned of the kidnapping well after Huang had

32

initiated the crime. Like the hypothetical rape victim in *Cooper,* Wertzberger and Ne'eman would not agree that the crime was completed once it was initially committed (i.e., when Huang ordered the victims into the house and held them captive). Further, as we discussed at length above, "the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and [the defendant] has reached a place of temporary safety . . . ." (*Barnett, supra,* 17 Cal.4th at p. 1159; *Burney, supra,* 47 Cal.4th at p. 233.)

Given *Barnett* and *Burney*, the crime of kidnapping for extortion was in progress when Frandsen and Turner arrived at Huang's house on December 2. Even assuming Frandsen had no idea Ne'eman and Wertzberger were at the house when they arrived, it is undisputed Frandsen subsequently participated in keeping them captive. He immediately stood in front of them and pounded his fist into his palm as an act of intimidation. By his own testimony, Frandsen guarded Ne'eman while Huang followed Wertzberger to the bathroom later that night. Moreover, Turner testified Frandsen came up with a plan to contact Ne'eman's family and demand $5,000 to let the victims go, then sought to carry out that plan with Huang. Similarly, Huang went through Ne'eman's suitcase and wallet after Frandsen arrived. The offense of kidnapping for extortion was not complete at the time Frandsen chose to participate in it. Thus, ample evidence supports a finding Frandsen aided and abetted kidnapping for extortion.

## IV. There Was No Prosecutorial Misconduct

Frandsen next contends the prosecutor committed prejudicial misconduct during her closing argument. We disagree.

33

## A. The Prosecutor's Statements

Frandsen takes issue with the following statements made at closing by the prosecutor:

"Now, I will submit to you, ladies and gentleman, that during the discussion of this case and the evidence that was presented, and whether there is enough evidence to prove the charges, you will see, and the evidence will show you, that there is way more than was proved that involuntary manslaughter and just second degree murder. Way more. You will see that the evidence shows you that there were two counts of first degree murder proved, but it doesn't - - that makes no matter. That's neither here nor there. The charges are involuntary manslaughter and second degree murder."

"And it's unfortunate that Ben Wertzberger gets an involuntary, but that's what's charged. But anyway you look at it, he's guilty of murder of both those victims."

"Ladies and Gentleman, this defendant is guilty of two first degree murders. And we got him charged with one second and one invol[untary manslaughter]. If you think that he's got anything less than a second and an invol[untary manslaughter], by all means, don't even read the instructions, just find him not guilty."

"It's really a murder but it's charged as an invol[untary manslaughter], and whatever benefit of the doubt the defense wants to give this defendant, it's already in the charges like I told you when I argued this case to you on Friday."

Frandsen acknowledges he failed to object to the remarks at the time they were made. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Nevertheless, he urges us to reach the merits in order to forestall a claim of ineffective assistance of counsel.

34

We agree the issue was forfeited. Accordingly, we consider Frandsen's prosecutorial misconduct claim within the context of an ineffective assistance of counsel argument.

### B. Applicable Law

To establish entitlement to relief based upon a claim of ineffective assistance of counsel, the burden is on the defendant to show "(1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Lewis* (1990) 50 Cal.3d 262, 288; *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).) A defendant establishes a reasonable probability of a more favorable determination when he persuades a reviewing court that the result of his trial was fundamentally unfair or unreliable. (*Strickland*, at p. 694; *People v. Shazier* (2014) 60 Cal.4th 109, 127 (*Shazier*).)

"When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

To prevail on a claim of prosecutorial misconduct based on the prosecutor's remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (*Shazier, supra*, 60 Cal.4th at p. 127.) At closing, a prosecutor

has wide latitude to discuss and draw inferences from the evidence presented at trial, and the question of whether the inferences the prosecutor draws are reasonable is generally for the jury to decide. (*Shazier, supra*, 60 Cal.4th at p. 127.) For their part, "[j]uries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the 'statements of advocates.' Thus, argument should 'not be judged as having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. [Citations.]' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21, quoting *Boyde v. California* (1990) 494 U.S. 370.)

## C. The Prosecutor's Closing Remarks Were Proper

Frandsen interprets the prosecutor's remarks to mean the charges against him were a result of prosecutorial leniency and that any reasonable doubt that was due to him was incorporated in the charges. We do not read them that way and as a result, do not find that trial counsel provided ineffective assistance in failing to object.

A review of the prosecutor's remarks shows she told the jury she had not only proved the charged offenses beyond a reasonable doubt, but that the evidence showed Frandsen's true culpability for the deaths of Wertzberger and Ne'eman was even greater than that with which he was charged. When she explained the different forms of liability—as a perpetrator, an aider and abettor, and a coconspirator—she acknowledged what would have seemed apparent to the jury: that the evidence supported a murder charge against Frandsen for the death of Wertzberger rather than just an involuntary manslaughter

36

charge. To that end, she told the jury that "it's not about whether we agree with the charges. The charges are the charges." Her remarks did not imply the charges were reduced or leniency was extended.

Moreover, the prosecutor expressly discussed the reasonable doubt standard in her closing. Frandsen does not contend the prosecutor misstated the reasonable doubt standard in her remarks. We do not consider the prosecutor's remarks to amount to deceptive or reprehensible methods to persuade the jury.

Additionally, the trial court instructed the jury as to the proper standard of proof by giving CALCRIM No. 220 on reasonable doubt. Nothing in the record suggests that any juror did not understand or did not follow the court's instructions. (*People v. Hajek* (2014) 58 Cal.4th 1144, 1229, abrogated on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1215–1216.) Thus, the prosecutor's argument, considered in its totality, did not constitute error, and defense counsel's failure to object to the prosecutor's closing statement did not constitute ineffective assitance.

## V. Victim Restitution Was Properly Imposed

Frandsen relies on double jeopardy principles to argue the trial court abused its discretion by imposing victim restitution in an amount greater than was previously awarded after his two other trials, and which was not ordered to be paid jointly and severally with Huang.

At sentencing, the trial court imposed victim restitution of $11,749.20, the amount the prosecution indicated was paid for burial and funeral expenses. Defense counsel indicated he had no objection to the amount of restitution, which he said had

37

previously been ordered to be paid jointly and severally with Huang. However, he objected to newly claimed losses for investigators hired by the Ne'eman family to search for their son. Over defense counsel's objection, the trial court awarded restitution in the amount of $16,549 to the Ne'eman family.

We find Frandsen's double jeopardy argument at odds with well-established legal authority. As Frandsen acknowledges, "*People v. Harvest* (2000) 84 Cal.App.4th 641, 650 [*Harvest*] and subsequent cases have held that for double jeopardy purposes, victim restitution does not constitute punishment. Direct restitution to redress economic losses is not a criminal punishment. (*People v. Kunitz* (2004) 122 Cal.App.4th 652, 657; *Harvest, supra,* 84 Cal.App.4th at pp. 645, 649.)" In *Harvest,* the court ordered victim restitution for the first time at resentencing following an appeal. It held that the prosecution's initial failure to seek restitution did not preclude a reasonable victim restitution order after reversal on appeal or the grant of a habeas corpus petition. (*Harvest, supra,* at pp. 645–650.) Accordingly, the court's order of additional victim restitution in this case was well within its authority.

The Attorney General notes that the abstract of judgment lists only the original $11,749.20 victim restitution award, but not the additional $16,549. We order this error corrected.

## VI.  Frandsen Has Forfeited His Challenge to the Assessments and the Restitution Fine

At sentencing, the trial court imposed court operations assessments totaling $60 (§ 1465.8, subd. (a)(1)), court facilities assessments totaling $60 (Gov. Code, § 70373), and a $10,000

restitution fine (§ 1202.4, subd. (b)).[5] In supplemental briefing, Frandsen challenges the imposition of the assessments and restitution fine on due process grounds. Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), he requests we vacate the assessments and impose a stay of the restitution fine until the People prove he has the ability to pay.

Frandsen, however, concedes his trial counsel failed to object to the assessments or the restitution fine at sentencing. As a result, Frandsen has forfeited this challenge. (*People v. Avila* (2009) 46 Cal.4th 680, 729 [finding forfeiture where the defendant failed to object to imposition of restitution fine under former section 1202.4 based on inability to pay] (*Avila*).)

Frandsen asserts there was no forfeiture because he presents a purely legal claim that can be raised for the first time on appeal. Contrary to his assertion, he does not present a pure question of law based on undisputed facts. (*People v. Yeoman* (2003) 31 Cal.4th 93, 118.) Rather, he requests a factual determination of his alleged inability to pay based on a record that contains nothing more than his reliance on appointed counsel at trial.

Frandsen further contends his failure to object at sentencing is excused because *Dueñas* represents a dramatic and unforeseen change in the law governing assessments and restitution fines. As a result, the law was against him at the time of his sentencing hearing and any objection to the assessments and restitution fine would have been futile. Not so.

---

[5]     The trial court noted the restitution fine and assessments were to be affixed as they were in 2002. The current assessment under section 1465.8 is $40 per conviction. (§ 1465.8, subd. (a)(1).)

Section 1202.4 expressly contemplates an objection based on inability to pay.

Section 1202.4, subdivision (b), requires a court to impose a restitution fine in an amount not less than $300 and not more than $10,000 in every case where a person is convicted of a felony unless it finds compelling and extraordinary reasons not to do so. Section 1202.4, subdivision (c), specifies a defendant's inability to pay is not a compelling and extraordinary reason to refuse to impose the fine, but inability to pay "may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $300]." While the defendant bears the burden of demonstrating his or her inability to pay, a separate hearing for the restitution fine is not required. (§ 1202.4, subd. (d).) Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed. (*Avila, supra,* 46 Cal.4th at p. 729; see *People v. McMahan* (1992) 3 Cal.App.4th 740, 749–750.)

Here, the trial court imposed the maximum restitution fine. Frandsen was thus obligated to object to the amount of the fine and demonstrate his inability to pay anything more than the $300 minimum. Such an objection would not have been futile under governing law at the time of his sentencing hearing. (§ 1202.4, subds. (c)–(d); *Avila, supra,* 46 Cal.4th at p. 729.)

We likewise reject Frandsen's contention that any objections to the assessments imposed pursuant to section 1465.8 and Government Code section 70373 would have been futile. Although both statutory provisions mandate the assessments be imposed, nothing in the record of the sentencing hearing indicates that Frandsen was foreclosed from making the same

request that the defendant in Dueñas made in the face of those same mandatory assessments. Frandsen plainly could have made a record had his ability to pay actually been an issue. Indeed, Frandsen was obligated to create a record showing his inability to pay the maximum restitution fine, which would have served to also address his ability to pay the assessments. Given his failure to object to a $10,000 restitution fine based on inability to pay, Frandsen has not shown a basis to vacate assessments totaling $120 for inability to pay.

More fundamentally, we disagree with Frandsen's description of *Dueñas* as "a dramatic and unforeseen change in the law . . . ." (Cf. *People v. Castellano* (Mar. 26, 2019, B286317) ___ Cal.App.5th ___ [2019 WL 1349472] (*Castellano*) [*Dueñas* was "a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial"].)

*Dueñas* was foreseeable. Dueñas herself foresaw it. The *Dueñas* opinion applied "the *Griffin-Antazo-Bearden* analysis," which flowed from *Griffin v. Illinois* (1956) 351 U.S. 12, *In re Antazo* (1970) 3 Cal.3d 100, and *Bearden v. Georgia* (1983) 461 U.S. 660. (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.) The *Dueñas* opinion likewise observed " '[t]he principle that a punitive award must be considered in light of the defendant's financial condition is ancient.' (*Adams v. Murakami* (1991) 54 Cal.3d 105, 113.) The Magna Carta prohibited civil sanctions that were disproportionate to the offense or that would deprive the wrongdoer of his means of livelihood. [Citation.]" (*Dueñas, supra*, 30 Cal.App.5th at p. 1169.)

41

*Dueñas* applied law that was old, not new.  We therefore stand by the traditional and prudential virtue of requiring parties to raise an issue in the trial court if they would like appellate review of that issue.

## DISPOSITION

The abstract of judgment is corrected to include an additional $16,549 victim restitution award.  The superior court shall issue an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

## CERTIFIED FOR PUBLICATION


BIGELOW, P. J.


We concur:


GRIMES, J.


WILEY, J.


42