Filed 12/20/24  P. v. Snow CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>EUGENE SNOW,<br><br>    Defendant and Appellant. | A168931<br><br>(Alameda County<br>Super. Ct. No. 147618) |

The trial court found defendant Eugene Snow qualified as a sexually violent predator (SVP) and ordered him committed to a state hospital for an indeterminate term pursuant to the Sexually Violent Predator Act.  (SVPA; Welf. & Inst. Code, § 6600 et seq.)[1]  Snow challenges the sufficiency of the evidence underlying a requirement for his commitment—i.e., that he was likely to commit a future predatory act.  He further contends that the terms "likely" and "predatory" as used in the SVPA are unconstitutionally vague and that SVPA's indeterminate sentencing violates the due process, ex post facto, and double jeopardy clauses of the federal and state Constitutions.  We affirm.

_____

    [1]  Further undesignated statutory references are to the Welfare and Institutions Code.

1

# BACKGROUND

In 2008, the People filed a petition to commit Snow for an indeterminate term as an SVP pursuant to the SVPA, and the trial court found there to be probable cause that Snow met the criteria for commitment. Over the next 14 years, the matter was continued multiple times for a variety of reasons, including substitution of counsel, additional expert evaluations, motion practice, and developing case law. Snow waived his right to a jury trial, and a court trial was ultimately held in 2022, after which the court found Snow met the SVP criteria and committed him to an indeterminate term at the California Department of State Hospitals (DSH).

## I. *The Prosecution's Case*

### A. *Evidence of Snow's Predatory Acts in the Commission of Prior Offenses*

At the April 2022 SVP court trial, the People presented testimonial and documentary[2] evidence of Snow's commission of two predicate offenses and two additional sexual offenses against children to prove Snow "has been convicted of a sexually violent offense against one or more victims," and to show "[t]he details underlying the commission of [those] offense[s] . . . , including a predatory relationship with the victim[s]" as required by section 6600.[3]  (§ 6600, subd. (a)(1).)

---

[2] Section 6600, subdivision (a)(3), permits the existence of any prior convictions to be shown with documentary evidence.

[3] " 'Sexually violent offense' means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person, . . . and result in a conviction . . . , as defined in subdivision (a):  a felony violation of Section 261, 262, 264.1, 269, 286, 287, 288, 288.5, or 289 of, or former Section 288a of, the Penal Code, or any felony violation of Section 207, 209, or 220 of the Penal Code, committed with the intent to commit a violation of Section 261, 262,

The first offense occurred on April 23, 1983, when Snow was 17 years old and the victim, J.M., was 5 years old. J.M.'s mother, K., testified that Snow's mother, P., "invited [K. and her family] over." J.M. and Snow had met merely "[t]wice, if that many [times]," prior to the visit. J.M. and Snow "didn't play together"; they had "met more in passing."

Around 9:00 p.m., K. sent J.M. to get help from Snow with putting on his pajamas. But J.M. returned still dressed and said that Snow had " 'tried to put his penis in my bottom.' " The adults called the police. J.M. told police that Snow "had been tickling him" and said if J.M. would not "play a game, he's going to tickle." Snow said, "This won't hurt you" and told J.M. to put his pants down. Snow then "Put his wee-wee in my booty."[4] A juvenile petition was sustained for a felony violation of Penal Code section 288, subdivision (a), for willfully committing a "lewd or lascivious act, . . . , upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."

The second offense—and first qualifying predicate offense—occurred two years later, in April 1985, when Snow was 19 years old. About one month prior, having completed juvenile custody and spent time in foster care,

_____

264.1, 286, 287, 288, or 289 of, or former Section 288a of, the Penal Code." (§ 6600, subd. (b); see *id.*, subd. (a)(2) [expanding definition of "sexually violent offense" to convictions of offenses described in subdivision (b), as well as those with the same elements in other jurisdictions or under predecessor statutes].)

[4] At the SVP trial, the responding officer testified and read portions of his police report into the record as a past recollection recorded. (See Evid. Code, § 1237.) J.M. testified that he did not recognize Snow nor recall "much" from his interaction with the police, but he attested that he "wouldn't have lied" to the police.

Snow moved in with his sister C. and her family, including C.'s three-year-old son, J.J.

C. testified that Snow did not "have much interaction[]" with J.J. during the first month he lived with the family. But on April 27, 1985, when C. was hospitalized in connection with the birth of her daughter A.S., C.'s husband caught Snow alone with J.J.

At the SVP trial, J.J. testified that he remembered being in Snow's room, naked, laying down underneath a sleeping bag or blanket with Snow behind him. J.J. recalled: Snow "was rubbing up against me and stroking his penis between my thighs and trying to push his penis into my rectum as he went along." "At first he was behind me and then he was kind of lying down on top of me, trying to force himself into me. [¶] [H]e had one arm wrapped around me kind of holding me in place." J.J. couldn't breathe, explaining, "because he's heavy. He's a big guy. I was just a little kid." J.J. was scared but did not yell because Snow, "told me I would get in trouble." J.J.'s father came in "yelling and cussing," and then "the police were there and they wanted to talk to me, and I was just really scared. I thought I was in big trouble. I believed him when he told me that I would get in trouble. I thought that I had done something wrong." Consequently, Snow pled guilty to a lewd act on a child under the age of 14 under Penal Code section 288, subdivision (a). Snow also had to register as a sex offender under Penal Code section 290.

The third offense for which evidence was presented took place three and a half years later in October 1988 against his sister C.'s three-and-a-half-year-old daughter, A.S. By this time, C. and her children had moved into a new home with P. (C.'s and Snow's mother). C. testified that A.S. had never had a relationship with Snow. Indeed, A.S. had been newly born and was

4

still in the hospital when Snow committed the offense against J.J.; C. had cut off contact with Snow after that incident.

A.S. testified that she vaguely remembered having been in the bathroom with P., taking a bath; but Snow was also there, standing "by the bathtub." This was the only time she remembered meeting Snow. A.S. further recalled feeling a burning sensation in her "private area" and her grandmother "screaming" before "rush[ing] [A.S.] to the hospital."

As described in the police report, A.S. told the responding officer at the hospital that same day that " '[w]hile she was playing [outside her home], [Snow] came and played with her. [Snow] reached under her pants and panties. She state[d], quote, "He put his fingernail in my kitcat," end of quote.' "[5] For the offense against A.S., Snow pled guilty to attempted lewd act on a child under the age of 14. (§§ 288, subd. (a), 664.)

Snow committed the fourth offense, which qualifies as a second predicate offense, about a decade later, between August 1998 and January 1999.[6] Snow, then 32 years old, invited a woman and her 8- and 12-year-old daughters to live with him. He did this despite knowing he was not supposed to be around children under the age of 12 because he was a registered sex offender. Eight-year-old S. reported to the police that, on one occasion, Snow "pushed her down onto the bed and pulled open her legs" and, using a pocketknife, made a hole in her pants larger. Snow then "stuck his finger in the hole and rubbed her vaginal area over her underwear." For the offense

---

[5] Again, the responding officer read portions of his police report into the record. (See Evid. Code, § 1237.)

[6] The facts surrounding this conviction entered the record through documentary evidence, including the police report and affidavits attached to the warrant.

5

against S., Snow pled guilty to a lewd act on a child under the age of 14 under Penal Code section 288, subdivision (a).

## B. *Snow's Unsuccessful Participation in Treatment*

In support of their SVP allegations, the People called the lead psychologist on Snow's treatment team at Coalinga State Hospital, Dr. Rachel Hochstetler, to testify about Snow's refusal to participate in the Sex Offender Treatment Program (SOTP).

Dr. Hochstetler explained that Snow had completed one of SOTP's four modules but dropped out of SOTP's second module because of a dispute about printing "his life story." Snow declined to reenroll in SOTP despite regular encouragement to do so and also declined to enroll in other treatment groups that would benefit him, such as anger management.

Dr. Hochstetler further testified that Snow denied committing any crimes, claiming his victims lied. Although Snow was no longer enrolled in SOTP, Dr. Hochstetler explained that such a denial of responsibility "would be a failure in [SOTP]" because discussing prior offenses is critical to SOTP's goal "to prevent future offenses." She postulated that Snow could prepare for a successful release into the community by participating in SOTP and developing a relapse prevention plan.

## C. *Expert Testimony*

The People called two expert forensic psychologists, Dr. Craig King and Dr. Mark Patterson, both independent evaluators contracted by DSH to evaluate Snow and opine on his likelihood for committing future predatory acts. Each was offered as an expert in forensic psychology and sexually violent predator evaluations pursuant to section 6600.

Dr. King testified as to his two SVP evaluations of Snow conducted in June 2020 and July 2021. Each time, Dr. King determined that Snow met all

6

three criteria for classification as an SVP—i.e., Snow was (1) convicted of a sexually violent offense and (2) diagnosed with a mental disorder that (3) makes him likely to engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).)

Dr. King assessed Snow's risk for recidivism by using the "Static-99R," an actuarial measure of one's risk for sexual reoffense, as well as certain "dynamic risk factors" correlated with sexual reoffense. Dr. King found Snow scored in the 89th percentile of the Static-99R and therefore was "about 2.7 times more likely to commit another sex offense than the typical or average sex offender." Beyond this elevated "baseline" risk assessment, Dr. King also found Snow "has a number of dynamic risk factors that make him vulnerable to sexual re-offense," including a history of victimizing prepubescent male and female victims, insufficient deterrence from repeated incarceration, denial of wrongdoing, lack of empathy, and dropping out of SOTP. Based on those factors, Dr. King opined Snow presented an above-average risk for reoffense as a result of his mental health disorder.

Relatedly, based on Snow's relationship with his prior victims which he characterized as predatory, Dr. King concluded that Snow's "future potential crimes . . . would be predatory." Specifically, he opined: Snow "did not have a substantial relationship with [J.M.]" because Snow "only knew [J.M.] for a few months"; Snow had "no established relationship" with J.J. because Snow had "very limited contact with him" in the month they lived in the same residence; Snow "met [A.S.] shortly before he started sexually abusing her" and therefore "there was no substantial relationship there"; and there was "a very short duration" after S. moved in with Snow "before he started actually abusing her, so that would indicate that he . . . moved them in for the purposes of victimization . . . ."

7

Having reviewed the independent evaluation of Snow by Dr. Sreenivasan—an expert later called by the defense (whose testimony is discussed below)—Dr. King disputed the basis for her opinion that Snow was not likely to reoffend. Specifically, he disagreed that recidivism risk can be determined, in part, by reference to an individual's time in custody. Dr. King stated he knows of no evidence that "length of stay equals less risk," nor that recidivism risk is minimized by an individual's stated desire not to reoffend, because "the problem is controlling the impulse to act." On cross-examination, Dr. King acknowledged that Snow's current period of incarceration—23 years—was an order of magnitude greater than any of his previous sentences but expressed doubt that, if released, the possibility of a future lengthy sentence for any new offense would have any additional deterrent effect on Snow due to "his difficulty with cause and effect, his difficulty with weighing pros and cons, consequential thinking due to his cognitive limitations and deficits."

Dr. King had also reviewed an evaluation of Snow by another psychologist expected to be called to testify in Snow's defense, Dr. Charles Flinton. Dr. Flinton found that Snow presented an above-average risk for being charged with another nonconsensual sexual offense but concluded Snow was not likely to engage in sexually *predatory* criminal behavior because his past "victims were young children with whom he had significant, substantial relationships." Dr. King disagreed with Dr. Flinton's characterization of Snow's relationships with his victims as "significant" and "substantial," stating, "there's really no explanation for that opinion" other than its ostensible premise that Snow was biologically related to J.J. and A.S. and had briefly lived with J.J. and S. before committing offenses against them.

8

The People's other expert, Dr. Mark Patterson, found Snow would be likely to offend in a predatory manner based on his history of sexual offenses. Dr. Patterson conducted a risk assessment using "three different actuarial tools," including the Static-99R, as well as "another instrument that's designed to provide information on relevant dynamic risk factors that are complimentary to the static risk factors that are identified by the actuarial tools." Like Dr. King, Dr. Patterson found Snow's Static-99R score was 2.7 times higher than the typical sex offender. Dr. Patterson further found Snow's dynamic risk factors were "substantially above average," due, in part, to Snow's sexual interest in children of both genders, general sexual preoccupation, and lack of remorse. Moreover, in Dr. Patterson's view, Snow displayed a pattern of predatory offenses because there was no "strong evidence of a familial bond beyond the blood relationship" with J.J. and A.S. and Snow had not lived with S. "for very long at the time the sexual offending happened."

Dr. Patterson also found Snow's inchoate discharge plan to "self-isolate" to be unrealistic and self-contradictory because the jobs he envisioned taking, such as working in a grocery store, require social interaction and because Snow wanted to have children. Dr. Patterson testified he was not aware of any studies showing that "more mitigation accrues" the longer that a potential SVP is incarcerated.

## II. *The Defense Case*

The defense first offered the testimony of Dr. Sreenivasan, an independent evaluator contracted by DSH as an expert in the evaluation of sexually violent predators. Dr. Sreenivasan had evaluated Snow in 2005, 2008, 2012, and 2020. Although she had found Snow met the SVPA's criteria in each of her first three evaluations, after her 2020 evaluation,

9

Dr. Sreenivasan no longer believed Snow met the third criterion (i.e., his likelihood to engage in sexually violent criminal behavior).

Dr. Sreenivasan explained that "pedophilic disorder is not a condition that goes in remission," and, under her actuarial scoring, Snow continued to present an above-average risk of re-offense. Nonetheless, she pointed to "meta-analytic factors that didn't support [recidivism] risk," such as Snow's age and time in custody. Dr. Sreenivasan therefore concluded Snow no longer presented sufficient recidivism risk to qualify as an SVP.

However, despite this opinion that Snow was unlikely to reoffend, Dr. Sreenivasan further testified that, "based on the nature of the [past] victims," if Snow were to reoffend, his future crimes would likely be predatory. In particular, Dr. Sreenivasan pointed to Snow's "casual acquaintance with [J.M.]," and opined that Snow "established or promoted [his] relationship [with S.] in part for the primary purpose of sexual victimization." Regarding Snow's offenses against his nephew and niece, J.J. and A.S., Dr. Sreenivasan surmised the relationships were "probably more than casual acquaintances," but, "the age of the victim[s], his lack of involvement in their life, and the fact that he sexualized them would lead me to kind of—would lead me to say that these were opportunities that render the victim[s], even though they're related, probably in the realm of someone who is promoting the relationship[s] for sexual victimization."

Snow testified in his own defense. He asserted that he originally refused to enroll in SOTP because he was concerned that other patients would betray his confidence, and, in 2019, he dropped out of SOTP because of

10

unhelpful staff and a dispute about printing materials.[7]  Snow stated he would be willing to retry SOTP "[i]f a staff member is willing to help [him]" but continued to deny he committed any of the crimes for which he was convicted, other than his juvenile offense involving J.M.

### III.  *The Trial Court's SVP Finding*

The next day, the trial court announced a tentative verdict finding Snow met the criteria for commitment as an SVP.  The court prefaced its verdict by stating it was "convinced that the more credible evidence came from the People's doctors."  The court emphasized Dr. Hochstetler's testimony that Snow's efforts to get treatment were "lacking" and Dr. King's undisputed testimony that "pedophilic disorder is to be considered a lifelong affliction" that must be managed.  The court declined to "go through [the dynamic risk factors] in detail" but mentioned "the most salient risk factor" was Snow's "preference for pre-pubescent children," which "Mr. Snow has not addressed or made any progress on."

Citing both prosecution experts' disagreement with Dr. Sreenivasan's opinion, the trial court also stated that "no research" supports the theory that an SVP's recidivism risk is mitigated by merely the passage of time and a stated desire to avoid children.  Relatedly, the court found Dr. King's testimony that admitting guilt "is important for insight and learning to manage [one's] risk" to be "convincing testimony in part," especially because it did not believe Snow's claim that "he would seek out treatment on [his] release."

---

[7] The defense also called Lawrence Lowe, an inmate at Coalinga State Hospital, to testify.  Lowe attested to frequent turnover of his SOTP group's facilitator, as well as the cost of printing materials at the state hospital.

11

In September 2023, the trial court entered judgment and committed Snow to an indeterminate term with DSH. Snow appealed.

## DISCUSSION

Snow advances three challenges to the trial court's judgment and his resulting commitment. First, he asserts there was insufficient evidence that he was likely to commit future *predatory* sexual conduct, namely because the People's expert testimony at the SVP trial exceeded what is permissible. Second, Snow claims the terms "likely" and "predatory," as used in the SVPA, are unconstitutionally vague in violation of due process. Third, he asserts the SVPA's indeterminate term sentencing violates the due process, ex post facto, and double jeopardy clauses. Snow's contentions are without merit.

### I. *Substantial Evidence Supports the Trial Court's Findings that Snow is an SVP*

The SVPA defines a "sexually violent predator" as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) Thus, to be found to be an SVP, "the trier of fact must find, beyond a reasonable doubt, that the defendant is likely to commit sexually violent *predatory* behavior upon release." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1181–1182.) The statutory term "predatory" is defined as an act "directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

" 'In reviewing the evidence sufficient to support a commitment under [the SVPA], "courts apply the same test as for reviewing the sufficiency of the evidence to support a criminal conviction." ' " (*People v. McCloud* (2013) 213

12

Cal.App.4th 1076, 1088.) We " 'must review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] To be substantial, the evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible and of solid value.' " ' " (*Ibid.*) We "may not redetermine the credibility of witnesses, nor reweigh any of the evidence, and must draw all reasonable inferences, and resolve all conflicts, in favor of the judgment." (*People v. Poe* (1999) 74 Cal.App.4th 826, 830 [affirming evidence supported finding that SVP defendant was likely to engage in sexually violent behavior].)

Snow contends that insufficient evidence supported the court's finding that he is an SVP because: (1) the testifying experts impermissibly opined on the law because "predatory" is not a "psychological term[] and there is no scientific instrument used to determine whether an act is predatory";[8] and (2) the expert opinions regarding Snow's likely future predatory behavior were unsupported. We disagree and address each argument in turn.

First, the scope and nature of the admitted expert testimony was proper. The SVPA specifically and repeatedly provides for the appointment and use of experts by both the state and committed persons. (See, e.g., §§ 6601, subds. (d)–(g), 6603, subds. (a), (d), 6604.1, subd. (b), 6604.9, subd. (a), 6605, subd. (a)(3).) In determining an SVP defendant's likelihood of committing future predatory acts, this "expert testimony is critical" because the inquiry "involves a prediction about the individual's future behavior." (*People v. McKee* (2010) 47 Cal.4th 1172, 1192 (*McKee*) [construing section

---

[8] Snow does not challenge any expert's qualification nor the bases for their opinions, so we do not discuss them further. (See *Needham v. Superior Court* (2024) 16 Cal.5th 333, 368 (*Needham*).)

6608(a) to be "read in conjunction with section 6605, subdivision (a), to mandate appointment of an expert for an indigent SVP who petitions the court for release"], superseded by statute on another ground as stated in _People v. McCloud_ (2021) 63 Cal.App.5th 1, 14–15.) Expert testimony on the issue of predation is admissible, therefore, because "[t]hat inquiry is a subject beyond common experience, and a [fact finder] would be aided by expert testimony on the matter." (_Needham_, _supra_, 16 Cal.5th at p. 359 [People's expert may testify regarding offender's SVP qualification, but offender cannot be compelled to be interviewed by People's expert before commitment].) Such expert testimony "is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)

Snow's authorities do not say otherwise; they are unrelated to SVPA commitments and merely stand for the uncontroversial principle that an expert may not offer a legal conclusion. (See _People v. Baker_ (2012) 204 Cal.App.4th 1234, 1245 [it was beyond the scope of expert testimony to opine "[w]hether the arson posed a substantial danger of physical harm to others"]; _People v. Jo_ (2017) 15 Cal.App.5th 1128, 1176 [permitting an expert to testify as to a statutory defense because "the existence of such a law was sufficiently beyond common knowledge that the opinion of an expert would assist the trier of fact"]; _King v. State_ (2015) 242 Cal.App.4th 265, 292 [no error in excluding expert opinion that stop and frisk conformed to law enforcement policy].)

Second, rather than impermissibly providing their "own take on the legal meaning of the term," each expert explicitly relied on the statutory definition of "predatory" in forming their opinions. A predatory act encompasses acts against a "casual acquaintance with whom no substantial relationship exists." (§ 6600, subd. (e).) In concluding Snow's future conduct

14

was likely to be predatory, all explained their review and consideration of Snow's past acts, his failure to participate in SOTP, and his stated future plans formed the basis for their predictions. (See § 6600, subd. (a)(3); *Needham*, *supra*, 16 Cal.5th at p. 371 (conc. & dis. opn. of Groban, J.) [SVPA evaluators must consider criminal and psychosexual history among other factors in making SVP evaluations].)

For example, Dr. King recited section 6600's definition of "predatory" and explained that biological relation does not automatically create a substantial relationship: "a definition of substantial means that they had meaningful interactions and a significant amount of time together. There's a real relationship there. And also, you know, whether that relationship was promoted for the purpose of victimization." Dr. King explained the absence of a "substantial relationship" with each of the victims meant that Snow's future conduct was likely to be predatory as well: "his history of offending informs me about what his future second offending could look like if he were to offend. If he did not have a substantial relationship or he formed a relationship for the purpose of victimization or if the victim was a stranger, it's likely that he would follow that same pattern in the future."[9]

---

[9] For example, J.M. had "only met Mr. Snow at most two times prior to the victimization." J.J. had lived with Snow for about a month prior to the assault, and "[e]ven though it's a nephew, [J.J.] has very limited contact with [Snow]. And so there's really, again, no substantial relationship. So that would fall under predatory as well." Snow met A.S. "shortly before he started sexually abusing her. So it was a very small amount of time that he knew her. So once again, there was no substantial relationship there." Snow invited S.'s family to move in with him, but "[t]here's a very short duration of time before he started actually abusing [S.], so that would indicate that he either moved them in for the purposes of victimization, and he certainly didn't have a substantial relationship [to] the victim."

15

Dr. Patterson similarly relied on section 6600's definition of "predatory" in forming his conclusions that Snow's prior conduct was predatory in nature. As he explained, "Certainly the non-related victims -- unrelated victims -- were predatory offenses in my opinion. With his niece and nephew, while they were reportedly blood relatives, my understanding is that he had very little contact with his niece and nephew prior to the time that he committed sexual offenses against them. So barring that blood relation, so to speak, on paper, his actual relationship with them were more casual in my view than it was familial. [¶] . . . [¶] Qualitatively, I didn't see evidence that there was a substantial familial bond, for example, which is what we would look for as a potential barrier to offending against a family member. I didn't see strong evidence of a familial bond beyond the blood relationship." Dr. Patterson opinioned that the predatory nature of each of the prior assaults suggested Snow was likely to engage in predatory behavior in the future, "I think that goes with the idea of past behavior being the best predictor of future behavior, in general, including criminal behavior."

Dr. Sreenivasian similarly defined "predatory" consistent with section 6600, subdivision (e), explaining that "It's a stranger, casual acquaintance or someone with whom the person promotes a relationship for the purpose of gratification." She further opined that Snow's future crimes—if committed—would be predatory: "Well, it's really based on the nature of the victims. There's a -- related to him, and he was in proximity to them or they were unrelated, and basically a casual acquaintance like [J.M.]. [¶] And with [S.] he promoted the relationship for sexual victimization in that he said that he took her out to eat, I believe, and rode bikes with her, and also just inviting a woman with two children, eight and 12, young children, into his home to live with him given his history with -- you know, I'm inferring, that that would

16

represent an attempt to create an environment where he could access victims. So all of that would really fall within the purview of predatory."

We need not belabor the point. The documentary evidence and testimony relied on by the experts was statutorily permissible and provided sufficient basis to opine whether Snow was likely to commit further sexual predatory crimes. While Snow may disagree with the expert conclusions that Snow lacked "substantial" relationships with his victims, or that Snow's development of his relationships with J.M. and S. suggest he groomed them for purposes of victimization, there was ample support for those opinions and the conclusions drawn from them.[10]

Correspondingly, this expert testimony, when considered with the other evidence introduced, supports the trial court's determination that Snow qualified as an SVP. Indeed, in ruling, the court reiterated the undisputed expert testimony that Snow's pedophilic disorder is a lifelong affliction; highlighted "the most salient risk factor" was Snow's "preference for pre-pubescent children"; and found persuasive the expert opinions that Snow's refusal to participate in treatment or admit his guilt militated against his ability to reintegrate with society. Viewing the record in the light most favorable to the judgment, there was substantial evidence that Snow was likely to commit a predatory offense if not committed and, thus, he met the criteria for an SVP.

---

[10] We also observe that Snow provides no citations to the record in support of his suggestion that the experts "assume[d]" that "all crimes against children, other than by immediate family, are predatory." We accordingly disregard this point. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 Cal.App.4th 117, 150.)

## II. *The SVPA Is Not Unconstitutionally Vague*

Snow contends the SVPA's use of "likely" and "predatory" are unconstitutionally vague in violation of the due process clause. This argument lacks merit.

To start, we address the People's assertion that Snow forfeited his constitutional argument on appeal by failing to raise it before the trial court. "Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K.* (2007) 40 Cal.4th 875, 880.) But courts may exercise discretion to consider the merits of an otherwise forfeited challenge that "present[s] a pure question of law" or where "defendant did not have a meaningful opportunity to object at trial." (*Id.* at p. 887 & fn. 7.) This court has done so in the context of SVP commitments. (See, e.g., *People v. Curlee* (2015) 237 Cal.App.4th 709, 713–716 [rejecting a claim of forfeiture in determining an SVP defendant had been deprived of his constitutional right to equal protection when the district attorney called him as a witness at his own commitment trial]; *People v. Cannon* (2022) 85 Cal.App.5th 786, 794–795 [declining to apply forfeiture doctrine to equal protection challenge to SVPA], review granted on standard of review issue Feb. 15, 2023, S277995].) Because an SVP commitment "affects the committee's liberty interests [citation], . . . we deem it an appropriate exercise of our discretion to consider [committee's] contention for the first time on appeal." (*Curlee*, at pp. 715–716.) We therefore consider the merits of Snow's due process challenge.

" ' "[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " ' " (*People v. Fuentes* (2023) 87 Cal.App.5th 1286, 1294.) A statute is so vague as to violate due process if it " 'forbids or

requires the doing of an act in terms so vague' that people of 'common intelligence must necessarily guess at its meaning and differ as to its application.' " (*People v. Hall* (2017) 2 Cal.5th 494, 500 [probation conditions not unconstitutionally vague in failing to specify a violation required knowledge of contraband's presence and its restricted nature].) " 'The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." ' " (*People v. White* (2016) 3 Cal.App.5th 433, 453 [holding SVPA terminology "sexually violent criminal behavior" is not vague on its face].)

The principle of fair warning is satisfied, however, by merely " ' "a reasonable degree of certainty." ' " (*Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1288–1289 [antiharassment provisions of city rent control ordinance not unconstitutionally vague].) There is a "strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' " (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143 [prosecution for involuntary manslaughter based on criminal negligence not unconstitutionally vague].) Instead, a litigant must demonstrate the challenged statute is " ' "impermissibly vague in all of its applications." ' " (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 863, fn. 28 [holding vagueness issue was not properly before the court because it was not mentioned in the application for rehearing].)

When statutory terms are undefined, we give the words their usual and ordinary meaning. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) But we do not read terms in isolation; rather, " '[t]he particular context is all important' " in evaluating challenges based on claims of vagueness. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 [ruling provisions of an interlocutory injunction not impermissibly vague considering the context]; see *Wendz v. California Department of Education* (2023) 93 Cal.App.5th 607, 627 [viewing language in the context of the entire subdivision to define "composition" as used in Migrant Education Program].) Consequently, courts generally do " 'not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct.' " (*People v. McInnis* (2021) 63 Cal.App.5th 853, 862 [crime of aggravated kidnapping and sentencing enhancement for aggravated kidnapping not void for vagueness in violation of due process].)

### 1. *The Statutory Term "Likely" Is Not Vague*

As mentioned above, to be committed as an SVP a person must have "a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is *likely* that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1), italics added.)

We first observe that our Supreme Court has already addressed the meaning of the term "likely" as used in SVP commitment trials and probable cause hearings. (*People v. Roberge* (2003) 29 Cal.4th 979, 982 (*Roberge*) [defining "likely" under § 6600, subd. (a)]; *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922 [defining "likely" under § 6601, subd. (d)].) In these contexts, "likely" means " 'the person presents a *substantial danger,* that is, a *serious and well-founded risk*, that he or she will commit [sexually violent] crimes if free in the community.' " (*Roberge*, at p. 982; see *id.* at

20

p. 988.) This standard " 'connotes much more than the mere *possibility* that the person will reoffend,' " but it " 'does not require a precise determination that the chance of reoffense is *better than even.*' " (*Id.* at p. 986.)

Snow claims the Supreme Court's articulation of the "likely" standard is constitutionally suspect. He argues the court "failed to address the bottom threshold, i.e. the less than 50 percent" and "it is not enough" for courts to conclude a standard cannot be demonstrable with mathematical precision. In support of his position, Snow points to a study reporting that jurors held varied opinions regarding which level of probability correlates with "likely." Snow therefore contends it is incumbent on the judiciary to "again speak to the subject." We are unpersuaded.

Again, in the context of the SVPA, the term "likely" means " 'the person presents a *substantial danger,* that is, a *serious and well-founded risk,* that he or she will commit [sexually violent] crimes if free in the community.' " (*Roberge, supra,* 29 Cal.4th at p. 982.) "The word 'substantial' is not vague, overbroad, or ambiguous. [Citations.] It requires no further definition, is readily understandable, and has no technical meaning peculiar to the law." (*People v. Boyce* (2014) 59 Cal.4th 672, 711 [holding the words "so substantial" adequately convey the degree of certainty required for a death verdict]; see, e.g., *People v. Silver* (1991) 230 Cal.App.3d 389, 393–395 [controlling substances " 'substantially similar' " to other controlled substances not vague]; *People v. McInnis, supra,* 63 Cal.App.5th at pp. 862–864 [statutory language applying to conduct that "substantially increased the risk of harm" is reasonably certain even though is necessarily depends on particular facts and context].) Indeed, " 'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and

21

proper," "substantial," and the like.' " (*People v. Morgan* (2007) 42 Cal.4th 593, 606 [holding that "the phrase 'substantial distance' meets the constitutional requirement of reasonable certainty"].)

The same logic applies here. In the context of the SVPA, and as the Supreme Court has already explained, "substantial danger" means there is a "serious and well-founded risk" the defendant will commit a future sexual predatory crime. (*Roberge, supra*, 29 Cal.4th at p. 982.) This formation affords a person of ordinary intelligence with fair notice of the threshold level of risk sufficient to commit an SVP. (*People v. Hall, supra*, 2 Cal.5th at p. 500.) Accordingly, we do not find "likely" as used in the SVPA to be unconstitutionally vague.

### 2. *The Statutory Term "Predatory" Is Not Vague*

As discussed, the SVPA defines "predatory" as "an act . . . directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6660, subd. (e).) Snow contends this definition is unconstitutionally vague because "the use of additional undefined and ambiguous words . . . obscure rather than clarify [which] offenses are predatory." In particular, he takes issue with the undefined terms of "casual," "acquaintance," and "substantial relationship," arguing it is unclear whether the SVPA excludes interfamilial sex offenses. We disagree.

We doubt a person of common intelligence lacks understanding of the terms "casual" and "acquaintance." In fact, the Legislature saw fit to amend the SVPA's original definition of "predatory" by "add[ing] to that definition an act directed at a person of casual acquaintance with whom no substantial relationship exists" to, at least in part, "clarif[y]" the law's operation. (Sen.

22

Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3130 (1995–1996 Reg. Sess.), as amended July 15, 1996, p. 3; see Stats. 1996, ch. 462 , § 4, eff. Sept. 13, 1996.)  Those "terms have common meanings that require no further definition and fall far short of unconstitutional vagueness." (*People v. White*, *supra*, 3 Cal.App.5th at p. 455 [holding the terms "predatory, sexual, and violent" are not vague]; see also *id.* at p. 453, fn. 7 [listing cases rejecting various constitutional challenges to the SVPA, including on vagueness grounds].)

Reading the entirety of subdivision (e) of section 6600 further elucidates this statutory language, where the phrase "a person of casual acquaintance with whom no substantial relationship exists" is contrasted with "a stranger" and "an individual with whom a relationship has been established." (§ 6600, subd. (e); *Wendz v. California Department of Education*, *supra*, 93 Cal.App.5th at p. 627.)  Thus, a "casual acquaintance" is someone known to the SVP defendant, but with whom the defendant has not developed a substantial or established relationship.

As discussed above, the word "substantial" is not vague.  (*People v. Boyce*, *supra*, 59 Cal.4th at p. 711.)  Instead, it sharpens the meaning of the word it modifies.  (See *People v. Morgan*, *supra*, 42 Cal.4th at pp. 606–607.) We therefore reject Snow's contention that "substantial relationship" is vague and consequently find the term "predatory" as used in the SVPA is not vague and therefore does not violate due process.

## III. *The SVPA's Indeterminate Commitment Is Not Unconstitutional*

Finally, we dispense with Snow's contention that the SVPA's indeterminate commitment provision violates "the due process, ex post facto and double jeopardy clauses," which he raises to "preserve . . . for potential future federal review."  Snow provides no legal authority for this claim; he

merely asserts that "[t]he SVPA, taken as a whole, now amounts to unlawful secondary punishment after [Snow] has served his prison terms and paid his price for his misdeeds." Because he fails to "develop this point in any meaningful way" or "cite[] to legal authority" we may disregard it. (*Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 654.)

Moreover, as Snow acknowledges, our Supreme Court has rejected substantively identical facial challenges to the SVPA. (*McKee, supra,* 47 Cal.4th at pp. 1188–1211.) *McKee* considered and rejected claims that the state initiative authorizing indefinite SVP commitments violates the federal constitutional right to due process, the federal constitutional prohibition against ex post facto laws, and the federal constitutional right to equal protection under the law. (*Ibid.*) We see no reason to question the Supreme Court's holding and consider the issue settled.[11]

## DISPOSITION

The judgment is affirmed.

---

[11] We also observe that statutes substantially similar to the SVPA have been upheld by the United States Supreme Court. (E.g., *Kansas v. Hendricks* (1997) 521 U.S. 346 [upholding Kansas Sexually Violent Predator Act allowing commitment of people with a " 'mental abnormality' " who are likely to engage in "predatory acts of sexual violence"]; see also *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1163 ["The Kansas scheme applied to sex offenders who suffer from a mental disorder which impairs their ability to control sexually violent conduct and which ' "makes the person likely" ' to engage in sexually violent crimes. [Citation.] The high court approved this statutory formula even though dangerousness was expressed in terms of a qualifying mental disorder giving rise to a likelihood of future criminal conduct"].)

_____
DESAUTELS, J.

We concur:


_____
RICHMAN, ACTING P.J.


_____
MILLER, J.

*People v. Snow* (A168931)

25